### SEAGOOD TRADING CORPORATION, Seagood Seafood, Inc., Falcon Food Service Company, Inc., Plaintiffs–Counterdefendants, Appellants,

v.

### JERRICO, INC., S & S Food Management Company, Inc., Defendants,

### Long John Silver's, Inc., United Maritime Fishermen, Ltd., Caribou Fisheries, Inc., Defendants–Counterplaintiffs,

### Martin–Brower Company, Defendant–Appellee.

### No. 89–3552.

United States Court of Appeals, Eleventh Circuit.

Feb. 14, 1991.

Blaine H. Winship, Winship & Byrne, Karin M. Byrne, Brandon, Fla., for plaintiffs-counterdefendants, appellants.

Terry J. Houlihan, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Martin–Brower Co.

John F. Dienelt, Reed, Smith, Shaw & McClay, Washington, D.C., for Jerrico, Inc.

Steven L. Brannock, Holland & Knight, Tampa, Fla., for Long John Silver's.

---

* Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

Before TJOFLAT, Chief Judge, ANDERSON, Circuit Judge, and ESCHBACH *, Senior Circuit Judge.

TJOFLAT, Chief Judge:

In this antitrust case, Seagood Trading Corporation and Falcon Food Service Company, Inc., claim that Long John Silver's, Inc., Martin–Brower Company, and others have conspired to drive them out of business, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1988). In essence, Seagood and Falcon contend that, in furtherance of this conspiracy, one or more of these firms have refused to deal with them and, moreover, have forced their customers to cease doing business with them. Invoking sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1988), they seek treble damages and injunctive relief. The case is presently before us for the purpose of reviewing the district court's order granting Martin–Brower summary judgment. After issuing the order, the court entered final judgment for Martin–Brower, finding that there was no just reason for delaying the entry of final judgment until the plaintiffs' claims involving the other defendants in the case had been resolved. *See* Fed.R.Civ.P. 54(b). We affirm the summary judgment, concluding that none of the plaintiffs' claims against Martin–Brower have merit.

## I.

### A.

Martin–Brower Company (M–B) is a distributor of food to restaurants throughout the United States and Canada. M–B specializes in servicing large restaurant chains, such as McDonald's, Red Lobster, and Arby's; for this reason, it has only a few clients. These clients, however, own or franchise over 6000 restaurants. M–B provides a wide range of services for its clients. For example, it maintains warehouses, including cold-storage facilities, where products needed by its customers are kept in inventory. It also operates a

fleet of refrigerated trucks that deliver products from its warehouses to the restaurants it services.

Long John Silver's, Inc. (LJS) owns and franchises fast-food seafood restaurants, known as Long John Silver's Seafood Shoppes, across the United States and in Canada and Japan. Of these shoppes, 880 belong to LJS and 532 belong to approximately fifty-three franchisees. The shoppes are the dominant providers of seafood in the fast-food market. They offer a variety of meals, primarily battered and breaded fried cod, shrimp, and chicken; seafood salads; side dishes, including french fries, corn on the cob, and hush puppies; and dessert pies. The staple of the shoppes' menus is frozen cod fillets; as a whole, the shoppes are the largest users of cod in the United States.

Besides owning and franchising shoppes, LJS also operates as a wholesale food distributor; it limits its service, however, to its own shoppes and those of its franchisees. LJS offers these shoppes all of the products they use in preparing and selling food to the consuming public. LJS is the sole supplier of the food used in its shoppes; it is the predominant supplier, competing with other food distributors, such as Seagood and Falcon, of the food used in its franchisees' shoppes.[1] The franchisees are required, by the terms of their franchise agreements with LJS, to purchase brands of food that have been approved by LJS' food and beverage department for use in the shoppes (both LJS-owned and franchised shoppes) and placed on LJS' "approved list";[2] thus, a competitor of LJS wishing to sell to a franchisee must have access to one or more of the approved brands of food on that list. LJS' food and beverage department constantly tests and evaluates the various brands of food available in the marketplace; the department does this, according to LJS, to ensure that the food the shoppes serve is of the highest quality. Accordingly, the brands on the approved list may change from time to time, depending on their quality.

M–B became involved with LJS in 1977. In that year, LJS hired M–B to take over its food distribution functions. Under the parties' arrangement, LJS purchases the food, including cod, from the independent suppliers in the marketplace; M–B, acting as LJS' agent, however, actually orders the food. M–B then arranges for the transportation of the food to its regional warehouses, where the food is stored; takes food orders from both the LJS–owned and franchised shoppes; delivers the food to the shoppes; and, overall, maintains an accounting of LJS' food purchases, sales, and inventory.[3]

In return for these services, LJS pays M–B a fee for each case of food delivered to an LJS-owned or franchised shoppe. This fee is determined in the following manner. Prior to the beginning of the fiscal year, M–B estimates the number of cases of food that it will deliver to the shoppes during that year, the costs it will incur in handling these cases, and the profit necessary to give it a reasonable return on the portion of its investment devoted to LJS' needs. M–B and LJS settle on these figures and arrive at the total fee (total costs plus total profits) that M–B expects to reap for the upcoming year. The total

---

1. LJS' food sales to its franchisees account for only a small percentage of LJS' total yearly profits; LJS makes most of its money from sales to the public by the shoppes it owns and from franchise royalties, which amount to a percentage of the franchisees' gross sales. For example, the district court found that from 1981–1986, sales to the public accounted for approximately 82% of LJS' gross profits and franchise royalties accounted for 13%. In comparison, sales of food supplies to franchisees comprised only 4% of LJS' gross profits during this time; frozen cod sales accounted for only 0.58% of LJS' profits.

2. The franchise agreements provide that LJS can terminate a franchise if the franchisee serves a brand of food that is not on the approved list.

3. In servicing its other accounts, M–B usually takes title to the food it stores and resells it to the restaurants for its own profit. M–B, however, prides itself on its willingness to customize its services to the needs of its clients. For LJS, M–B was willing to act as a bailee; LJS purchases, finances, insures, and collects money for the food it sells to the franchisees.

fee is then divided by the total number of cases M–B expects to deliver.[4] The resulting amount represents the portion of the total fee attributable to each case; at designated times during the year,[5] LJS pays M–B this amount for each case of food actually delivered by M–B. At the end of the fiscal year, there may be a significant disparity between the projected and actual revenue received by M–B from LJS; this is because of the uncertainty involved in estimating costs and the number of cases to be delivered. To remedy this, LJS and M–B make adjustments in the pay schedule for the following year to compensate for any variance. This system guarantees that, as closely as possible, M–B reaps the agreed-upon total fee.[6]

After it obtained the LJS account, M–B developed a highly efficient delivery system to service the shoppes. M–B, using its own trucks, provided weekly delivery service to each shoppe; it was able to furnish this service because of the efficiencies it realized from delivering food to such a large number of locations. At that time, most franchisees were purchasing all of their food requirements from LJS and this kept M–B's trucks full, thus keeping the transportation costs associated with each delivery to a minimum. M–B also divided the shoppes into geographic clusters and therefore gained further efficiencies by servicing each cluster from a regional

warehouse. Additionally, M–B realized even greater economies of scale by using its trucks to carry cargo for other clients on the return trips, a practice known as "backhauling." This practice further spread M–B's transportation costs across still more transactions.

The franchisees preferred this weekly service over the less frequent delivery service offered by competing food distributors because it allowed them to devote less space to the storage of frozen food products and it permitted them to order their supplies more precisely than they could otherwise.[7] Furthermore, the weekly delivery service allowed franchisees to spend less money on inventory, permitting them to invest their capital more profitably. Franchisees also preferred M–B's delivery service because M–B was, on the whole, more reliable than other deliverers.[8] Due in large part to the success of M–B's weekly delivery service, LJS maintained its domination over the market for sales of food to franchisees.

As would be expected, after M–B began delivering food to the shoppes on a weekly basis, it received requests from some of LJS' competitors—in particular, those who were wholesaling cod—to provide weekly delivery service to the franchisees' shoppes for their products as well.[9] These competi-

---

4. M–B estimates its total costs and the number of cases of food it will deliver by projecting the previous year's figures into the next year. Total cost includes the cost of investments in capital necessary to service LJS' account.

5. The record is unclear as to when LJS pays M–B.

6. For example, if in the previous year M–B actually garnered less revenue than it negotiated to receive, the pay schedule for the next year would overvalue the fee per case so that M–B could recoup the revenue it lost. The parties also would make downward adjustments in the fee for each case of food delivered if M–B earned greater revenue than LJS and M–B had anticipated.

7. Indeed, the record shows that, price and quality of the cod supplied being equal, franchisees preferred the weekly delivery service M–B provided for LJS products over the service of other suppliers. LJS' competitors, who were providing less supplies to the shoppes, could only

afford to offer monthly delivery service. This aggravated storage and ordering problems for those franchisees who purchased their cod from these suppliers; it also required large investments in inventory. See infra, pp. 1570–1571. Thus, M–B's weekly delivery service was valuable to LJS and was envied by LJS' competitors.

8. Indeed, the plaintiffs have alleged that it was impossible for them to employ a delivery service that was as reliable as M–B. M–B targeted a measured service level of 99.2%, meaning that on the average 992 out of 1000 cases would be delivered properly (i.e., no damage, correct supplies). According to M–B's expert, the industry average was a measured service level of 90–95%.

9. The record demonstrates that only one of the plaintiffs in this action, Seagood, asked M–B, in October 1982, to provide weekly delivery service for its cod to the shoppes, and that this was an isolated event. In 1980 and 1981, the president

tors wanted M–B to deliver their products in the same trucks that M–B used to deliver LJS' products so that they could experience the cost savings being realized by LJS. M–B's contract with LJS did not prohibit M–B from providing the same delivery service to LJS' competitors. M–B, nonetheless, turned down these requests.

LJS maintained its domination over the market for sales of food to franchisees until late 1979, when its competitors began offering food supplies to the franchisees for lower prices than LJS; even though they offered the franchisees only monthly delivery service, they were able to gain a competitive edge principally by pricing cod at a level significantly below LJS' price.

Prior to 1981, LJS had purchased its cod exclusively from Scandinavian suppliers, which were the only sources of LJS–approved cod. This cod, however, was also expensive; Canadian cod of similar quality was much cheaper. At the request of some franchisees, LJS, in late 1979, approved for use in the shoppes three Canadian brands of cod. Quality Cod Products (QCP), a wholesale competitor of LJS, entered into an exclusive, one-year contract with Caribou, the largest of the three Canadian suppliers, to purchase all of Caribou's cod (which met LJS' specifications) and immediately began selling this cod to franchisees. QCP sold its cod, delivered monthly, at a substantially lower price than LJS sold its cod, delivered weekly.[10] LJS stuck with its Scandinavian cod and offered the same package that it had in the past. The results were disastrous for LJS; QCP, according to the plaintiffs, quickly gained twenty-five percent of the total market.

LJS, of course, reacted to this change in the market. In 1981, QCP's exclusive contract with Caribou expired; LJS promptly outbid QCP for Caribou's cod supply for 1982, and Caribou began selling LJS all of the cod it packed that met LJS' standards.[11] In late 1982, LJS contracted with two other large Canadian cod suppliers to purchase the cod they packed that met LJS' standards; once again LJS bid more money than its competitors to purchase this cod. LJS continued each year, up to the present, to outbid its competitors for the cod supplies available from these Canadian sources. Once it obtained this new source of supply, LJS stopped buying and selling the Scandinavian cod. This allowed LJS to lower the price it charged the franchisees for cod and to begin recapturing the market share it had lost to its competitors, primarily QCP.

This loss of market share had, in the meantime, affected M–B's efficient weekly delivery service, which had been built on LJS' almost complete dominance in the market for sales of food to the franchisees. M–B had found itself running less than full loads to the shoppes, and this, of course, had increased the cost of delivering each case of food. To counter these increased costs, M–B, in December 1980, suggested to LJS that delivery service to the shoppes be reduced from weekly to biweekly and that a surcharge be imposed on those franchisees who insisted on weekly delivery service.[12] LJS adopted this suggestion, and M–B implemented it, effective January 1981. The purpose of this move was to reduce the cost of delivering small-case orders to shoppes. Franchisees purchasing seventy or more cases of food a week could continue, at no extra charge, to receive weekly delivery service. Franchisees pur-

---

of Quality Cod Products (QCP), a wholesale competitor of LJS, also requested that M–B provide weekly delivery service for its products to the franchised shoppes. QCP is not a party to this action.

**10.** In 1980, QCP's cod cost 30 to 40 cents per pound less than LJS'.

**11.** LJS offered Caribou 20 cents more per pound of cod than QCP had previously paid. This still made the Caribou cod cheaper than the Scandinavian cod for LJS.

**12.** M–B's president, Herb Heller, stated in an affidavit that prior to 1980 there was an 80–case minimum requirement imposed by M–B on each franchisee for deliveries of LJS products. This was done so that M–B could keep its trucks full and thus reduce the cost of delivering each case. No surcharge was developed to enforce this requirement, and, in fact, it was seldom enforced.

chasing less than seventy cases of food per week were given two options: they could elect to receive biweekly delivery service or they could pay a surcharge and continue to receive weekly delivery service. The surcharge increased as the number of cases ordered decreased; LJS, in effect, offered the franchisees a quantity discount.[13] LJS hoped that this new arrangement would encourage franchisees either to abide by the minimum delivery requirement or to use biweekly delivery service; in this way, M–B would be able to reduce its delivery costs per case. In fact, many franchisees opted for the biweekly delivery service in order to avoid the surcharge.

The new arrangement bore fruit, and LJS began to recapture the market share it had lost. LJS had successfully reduced the costs it incurred in delivering its food supplies to franchisees. LJS had also retained, in part, the weekly delivery service that franchisees preferred; even those franchisees who had opted for biweekly delivery service continued to prefer M–B's service over the monthly delivery service of LJS' competitors. Additionally, LJS was able to reduce the price of the cod it sold to franchisees by securing supplies of cod from Canadian sources. No longer did LJS' competitors have an edge over LJS in the price of cod. In fact, since LJS had exclusive contracts with the three largest Canadian cod suppliers, LJS' competitors were left to purchase small amounts of Canadian cod and the more expensive Scandinavian cod. Faced with this situation, LJS' competitors did not fare well—their costs increased and they were unable to match LJS' prices. Over time, many of LJS' competitors, like Seagood Trading Corporation and Falcon Food Service Company, withdrew from the market.

B.

In December 1982, Seagood[14] and Falcon filed this lawsuit against LJS,[15] S & S Food Management Company, Inc. (S & S) (an LJS franchisee with ten shoppes in Florida), M–B, and Caribou,[16] alleging violations of sections 1 and 2 of the Sherman Act[17] and seeking damages and injunctive relief under sections 4 and 16 of the Clayton Act.[18] Seagood and Falcon subsequently added United Maritime Fishermen, Ltd. (UMF), a Canadian corporation in the business of importing, processing, and wholesaling cod, as an additional party de-

**13.** Surcharges ranged from $20 to $40 per delivery. For example, a small order of under 50 cases would garner a total surcharge of $40.

**14.** The Seagood Trading Corporation and its parent, Seagood Seafood, Inc., are both plaintiffs in this action. We refer to them collectively as Seagood.

**15.** According to the plaintiffs' complaint, all activity performed by LJS was also performed by its parent company, Jerrico, Inc., also named as a defendant in this case. For ease of discussion, we attribute Jerrico's actions to LJS throughout this opinion; our analysis of the claims involving LJS is equally applicable to the claims against Jerrico, unless specifically noted.

**16.** In 1984, Caribou merged with Fishery Products, Inc. (Fishery), a Canadian business that sells fish, including cod, that is packed by its parent company. The plaintiffs alleged that Fishery, before this merger, was a participant in the alleged anticompetitive conspiracy; they did not, however, make Fishery a party defendant.

**17.** Section 1 of the Sherman Act provides, in pertinent part, that "[e]very contract, combination in the form of trust or otherwise, or con-spiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

Section 2 of the Sherman Act provides, in pertinent part, that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." *Id.* § 2.

**18.** These sections of the Clayton Act authorize private actions for violations of the antitrust laws. Section 4 authorizes a private action for treble damages and provides, in pertinent part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." *Id.* § 15(a). Section 16 authorizes a private action for injunctive relief, and provides, in pertinent part, that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws." *Id.* § 26.

fendant.[19] The plaintiffs brought their antitrust violations in six counts, one through six; they named M–B as a defendant in two of these counts, two and six. Count two alleged that LJS and M–B had conspired to have M–B refuse to deal with all of LJS' competitors in violation of section 1 of the Sherman Act. Specifically, the count alleged that LJS and M–B agreed that M–B would not store the plaintiffs' products or deliver them to the franchisees and that, in furtherance of this conspiracy, M–B had refused the plaintiffs' requests for these services.

Court six alleged that all of the defendants, including M–B, "conspired and agreed to restrain trade in violation of Section 1 of the Sherman Act and ... conspired to monopolize the purchase of frozen cod fillets, shrimp, french fries and chicken for distribution to LJS franchise shoppes ... in violation of Section 2 of the Sherman Act."[20] The plaintiffs, in effect, claimed that the antitrust violations alleged in counts one through five, taken together, amounted to independent violations of the Sherman Act; by incorporating by reference the allegations of the five counts, count six alleged that the defendants achieved the objects of their conspiracies to violate sections 1 and 2 of the Act. Count two, as explained above, alleged a concerted refusal to deal between LJS and M–B;

counts one, three, four, and five are explained below.[21]

Count one alleged that LJS had illegally tied the sale of its franchise rights to the sale of its food supplies in violation of section 1 of the Sherman Act. This tying arrangement was not explicit; instead, it was accomplished by coercing the franchisees to buy their supplies from LJS. According to the plaintiffs, LJS abused its power to list and delist the food products approved for purchase by the franchisees by either not applying the standards that it claimed would govern this process or applying these standards in an arbitrary and capricious manner. In this way, LJS limited, and in some cases precluded, the sale of products by its competitors, including the plaintiffs, to franchisees. This forced franchisees to purchase their supplies solely from LJS. Additionally, the plaintiffs claimed that LJS threatened the franchisees with financial hardships if they did not purchase their supplies from LJS. For example, LJS would threaten franchisees who did not purchase supplies from LJS that it would reject their bids for additional locations, open LJS-owned shoppes next to their shoppes, refuse to give the approval necessary to enable them to obtain financing to open new shoppes, or refuse to sell them these supplies in the future.[22] The

**19.** All references to the plaintiffs' complaint are actually to the plaintiffs' amended complaint.

**20.** For purposes of discussion, we treat cod fillets as the only food supply at issue in this case. Cod storage, delivery, and sales represent the bulk of the business at issue. The legal analysis, and the disposition, of counts two and six supplies equally to cod and the other food supplies involved.

**21.** The remaining counts did not allege antitrust violations. Counts seven through twelve, brought under the district court's pendent jurisdiction, alleged state-law violations. Counts seven through nine, involving S & S's rejection of the Caribou cod it purchased from Seagood (as alleged in count five, *see infra,* pp. 1564–1565), contained causes of action against LJS, Caribou, and S & S for interference with contractual relations or prospective advantage, breach of contract, and injurious falsehood. In counts ten and eleven, the plaintiffs alleged that LJS either induced or coerced M–B and the suppliers of cod on LJS' list of approved products not to do business with the plaintiffs and

thus committed the tort of interference with prospective advantage. Count twelve alleged that UMF breached its contract with Seagood for the sale of cod.

Counts thirteen and fourteen contained causes of action under federal and state Racketeer Influenced and Corrupt Organizations Acts, 18 U.S.C. § 1962(c)–(d) (1988) and Fla.Stat. § 895.03(3)–(4) (1989), respectively. Count fifteen alleged that LJS sold shrimp to the franchisees that did not meet its standards in violation of statutory fair competition, 15 U.S.C. § 1125(a) (1988). Count sixteen alleged that the actions taken by LJS as described in counts thirteen, fourteen, and fifteen constituted unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade in violation of Fla.Stat. § 501.204 (1989).

**22.** Beginning in March 1982, LJS informed franchisees that they would be guaranteed cod deliveries only if they were buying from LJS or had given 30 days notice of an intention to do so. LJS claimed that this plan, recommended by M–B, was necessary to ensure that cod would be

plaintiffs also alleged that LJS' surcharge arrangement was yet another method of coercing franchisees to buy its products—this would induce franchisees to order more cases of cod from LJS in order to avoid any surcharge. These actions, according to the plaintiffs, restrained trade by preventing free competition for the franchisees' business and allowed LJS to charge the franchisees supercompetitive prices for food supplies.

Count three alleged that LJS forced its cod suppliers, like Caribou and UMF, not to sell to independent distributors like the plaintiffs. LJS was able to achieve this end by refusing to approve the cod sold by these suppliers for use in the shoppes unless the suppliers agreed not to sell cod to LJS' competitors. Additionally, LJS refused to purchase cod from any supplier that sold directly to a franchisee. According to the plaintiffs, Caribou and UMF, as a result of these practices, refused to sell cod to independent distributors.[23] Thus, LJS, Caribou, and UMF conspired to restrain trade and acted to further this conspiracy in violation of section 1 of the Sherman Act.

Count four alleged that LJS "monopolized and conspired to monopolize" or "attempted to monopolize" the supply of frozen cod fillets for distribution to franchised shoppes in violation of section 2 of the Sherman Act. According to the plaintiffs, LJS cornered eighty-five percent of the approved cod supply[24] by buying small amounts of approved cod from numerous suppliers and enticing the suppliers not to sell to the independent distributors by paying them prices above the market level. LJS allegedly employed this predatory buying strategy to prevent competition from the independent distributors and to enable it to inflate the price of the cod fillets it sold to franchisees.

Count five, brought under section 1 of the Sherman Act, alleged that LJS, S & S, other LJS franchisees, and Caribou engaged in a concerted refusal to deal with the plaintiffs. According to the complaint, Seagood and Falcon, in August 1982, sold cod packed under the label of Caribou to franchised shoppes in Florida, including S & S-owned shoppes. Shortly thereafter, Caribou notified the shoppes that had purchased this cod that the cod did not satisfy the standards and specifications established by LJS and that the only cod packed under the Caribou label that did satisfy these standards was available exclusively from LJS. LJS then notified these shoppes that the cod they had purchased from Seagood and Falcon was not acceptable and that failure to remove this cod from their shoppes would result in the termination of their franchises. As a result of these acts, S & S and other unnamed franchisees revoked their acceptance of the cod Seagood and Falcon had delivered and returned the cod to them.

The defendants, in their answers to the complaint, denied that they had violated the antitrust laws;[25] according to them, the allegedly wrongful conduct constituted

---

fairly allocated to LJS' customers in times of shortage. The plaintiffs allege that this explanation is a mere pretext.

**23.** Count three also alleged that, in furtherance of this conspiracy, UMF breached its contract with Seagood for the sale of cod.

**24.** According to the plaintiffs, the approved cod supply equals approximately 50% of the total cod supply.

**25.** Several of the defendants also filed counterclaims against the plaintiffs. Caribou filed a counterclaim alleging trademark infringement and unfair competition. These claims arose from Seagood's and Falcon's sale of cod packed under the Caribou label to several franchisees in Florida in 1982—the same transaction outlined in count five of the plaintiffs' complaint. According to Caribou, the plaintiffs repacked Caribou's low quality cod (1–3 cod) in boxes marked with counterfeit Caribou labels so that they could pass it off as Caribou's high quality cod (1–2 cod); LJS had approved the use of 1–2 cod in the shoppes but not 1–3 cod. The plaintiffs then sold this mislabeled cod to several franchisees.

UMF also filed a counterclaim against the plaintiffs, alleging trademark infringement, unfair competition, and breach of contract. These claims also sprung from repacking schemes allegedly perpetrated by the plaintiffs and from Seagood's refusal to pay for 46,000 pounds of cod that it purchased from UMF.

nothing more than procompetitive, independent business decisions.[26]

Following extensive discovery, all the parties (except S & S) moved for summary judgment.[27] The district court granted M–B's motion and, as noted *supra,* entered final judgment for M–B on counts two and six pursuant to Fed.R.Civ.P. 54(b).[28] With respect to count two (refusal to deal), the court held [29] that the rule of reason, rather than the per se rule, applied. Under this analysis, the court found that the plaintiffs had failed to show any anticompetitive effects as a result of M–B's refusal to store and deliver their products. Instead, the court found that this refusal was procompetitive because it forced LJS' competitors to cut their prices in order to compete with LJS and, further, that M–B refused to provide this service to the plaintiffs in order to maintain the efficiency of its operation.

As to count six, the court found that the plaintiffs had "failed to support their rhetoric with evidence." The court found that the most the plaintiffs' evidence could establish was a conspiracy between LJS and M–B; it found no "meaningful" evidence linking M–B to a conspiracy among LJS and its suppliers. The court concluded that the evidence was insufficient to establish that M–B was a member of a conspiracy larger than that alleged in count two and that the plaintiffs' inability to establish M–B's membership in a conspiracy involving LJS and its cod suppliers mandated summary judgment in favor of M–B on count six.

The district court also granted LJS' motion for summary judgment on those portions of counts four and six that alleged that LJS had engaged in predatory buying to restrain trade, on those portions of counts two and six that asserted a conspiracy in restraint of trade between LJS and M–B, and on the allegations in the other counts of the complaint of a conspiracy or agreement in restraint of trade between LJS and UMF. With respect to the predatory buying claims, the district court found

26. For example, M–B claimed that it turned down the requests LJS' competitors made to have it deliver their food to the shoppes because those competitors were not the type of clientele that fit into M–B's successful business formula. M–B's president characterized these requests as "pos[ing] the question of whether we wanted to provide essentially a public warehousing and common carrier trucking service for a single product sold by a wholesaler that neither owned nor franchised restaurants." He concluded that providing this service would mean a departure from M–B's established business formula.

The defendants also asserted that some of the plaintiffs' claims were barred by the statute of limitations, that the equitable doctrine of "unclean hands" barred the plaintiffs' right to injunctive relief and treble damages, and that the plaintiffs had no standing to bring the claims alleged in the complaint.

27. In early 1985, the defendants moved for summary judgment on the antitrust claims. The district court denied these motions. After extensive discovery had been conducted and new Supreme Court cases clarifying the application of summary judgment to antitrust cases had been decided, the district court authorized another round of summary judgment motions. By the time these new summary judgment motions were filed, Caribou had merged with Fishery, had settled with the plaintiffs, and had been dismissed from the action.

28. Fed.R.Civ.P. 54(b) states, in pertinent part:

When more than one claim for relief is presented in an action, ... or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision ... which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and ... is subject to revision at any time before the entry of judgment....

The plaintiffs argued that it might waste judicial resources to delay their appeal of the dismissal of these claims until after the remaining claims were litigated. If the claims against M–B were reinstated on appeal, then a second trial involving essentially the same operative facts would be necessary. The district court, finding "no just reason for delay," granted this motion and directed the entry of final judgment in favor of M–B.

29. The district court adopted, without modification, the report and recommendation of the magistrate, to whom it had referred the motions for summary judgment, as its final order. All references herein to the conclusions of law of the district court are therefore to the conclusions of the magistrate.

these claims to be economically implausible. The court noted that LJS, as a restauranteur, was in stiff competition with other restaurants and that LJS made the bulk of its profits from sales by its shoppes to the public. Since any increase in cost borne by the shoppes for the purchase of supplies would lead to an increase in the price the shoppes charged the public for food and since such a price increase would impair LJS' ability to compete in the restaurant business, it was implausible to assume that LJS would artificially increase the price it paid for such supplies. Additionally, since LJS reaped much more profit from the royalties it received, which are based on the financial success of its franchised shoppes, than it received from the sales of supplies to franchisees, *see supra* note 1, it was implausible to assume that LJS would charge franchisees artificially increased prices for supplies.[30] This would only serve to make the franchised shoppes less competitive in the market and thus reduce LJS' royalties; this decrease in profits from royalties would not be offset by LJS' sales of supplies to the shoppes.

Finally, the court granted UMF's motion for summary judgment on all of the plaintiffs' antitrust claims against it. The court denied all other motions for summary judgment, including the plaintiffs'.[31]

On appeal, the plaintiffs contend that the district court erred in several respects. First, they argue that the court misapplied the law in granting summary judgment in favor of M–B as to the claims that, pursuant to a conspiracy with LJS, M–B refused to store and deliver the plaintiffs' products (count two) and that M–B conspired with the other defendants to restrain trade in the market for sales of cod to franchisees (count six). Had the court correctly applied the law, they argue, it would have

concluded that genuine issues of material fact exist and that summary judgment could not lie. The plaintiffs also contend that the district court failed to consider their claims that M–B conspired with LJS to tie the purchase of franchise rights to the purchase of supplies from LJS and that M–B conspired with the other defendants to monopolize the market for sales of cod to franchisees.

The plaintiffs' arguments are meritless. First, with regard to their claims in count two, we conclude that the district court was correct in applying the rule-of-reason standard instead of the rule of per se illegality. Applying this standard, the court properly found as a matter of law that M–B's refusal to deal with the plaintiffs had no anticompetitive impact; thus, even if M–B acted pursuant to an agreement with LJS, the refusal was lawful. Second, with regard to the claims in count six, the plaintiffs have failed to demonstrate a triable issue of fact as to M–B's membership in a conspiracy involving LJS and its cod suppliers. Finally, we find that, contrary to the plaintiffs' assertion, the district court recognized and considered all of the claims the plaintiffs presented against M–B.

## II.

In the discussion that follows, we first address, in subpart A, the plaintiffs' claim in count two of their complaint that, in conspiracy with LJS, M–B refused to deal with them. We then turn, in subpart B, to the claim in count six alleging that M–B conspired with LJS and the other defendants to restrain trade in the market for sales of cod to LJS franchisees. Finally, we address, in subpart C, the plaintiffs' assertion that the district court failed to recognize and address their claims in

---

**30.** As previously noted, sales of supplies to franchisees made up a small part of LJS' total gross profit. *See supra* note 1. In addition, the district court found that LJS' average gross profit margin for the sale of supplies to franchisees decreased from 5.5% in 1978 to 2.5% in 1986. The average gross profit margin for such sales from 1978 to 1986 was 4%; the average gross profit margin for sales of cod to franchisees during this time was 2.81%. This convinced the district court that it was implausible that LJS sacrificed higher royalties resulting from sales to the public by franchised shoppes in order to reap higher profits from sales of supplies to franchisees.

**31.** The plaintiffs were granted summary judgment with respect to count five of UMF's counterclaim alleging common-law unfair competition.

counts two and six, respectively, that M–B participated in LJS' illegal tying arrangement and that M–B conspired with LJS and its cod suppliers to monopolize the market for purchasing cod used by the franchisees.

### A.

As stated earlier, the plaintiffs alleged, in count two of their complaint, that M–B, having conspired with LJS to do so, refused to store the plaintiffs' food products and deliver them to franchisees and that this concerted refusal to deal violated section 1 of the Sherman Act. The district court analyzed this claim under the rule of reason and, finding no evidence of any anticompetitive market impact, granted M–B summary judgment. The plaintiffs argue that the district court erred by applying the rule of reason instead of the per se rule of illegality to this claim. Alternatively, the plaintiffs argue that if the rule of reason does apply, the district court erred by looking for anticompetitive effects in the market for restaurant delivery services instead of the market for the sale of approved supplies to LJS franchisees.

### 1.

■ The presumption in cases brought under section 1 of the Sherman Act is that the rule-of-reason standard applies. *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724, 108 S.Ct. 1515, 1520, 99 L.Ed.2d 808 (1988). Some violations of section 1, however, are illegal per se "because of their pernicious effect on competition and lack of any redeeming virtue," *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958); that is, the conduct involved "always or almost always tend[s] to restrict competition and decrease output," *Northwest*

*Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 289–90, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (quoting *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979)). Thus, courts "conclusively presume [these agreements] to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.* at 289, 105 S.Ct. at 2617 (quoting *Northern Pac. Ry.*, 356 U.S. at 5, 78 S.Ct. at 518).[32] The Supreme Court has made it clear that the per se label should be applied infrequently and with caution. *See Business Elecs.*, 485 U.S. at 723, 108 S.Ct. at 1519; *White Motor Co. v. United States*, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963).[33] This label is applied "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983). This cautious approach is mandated in light of the potential costs to the marketplace that would result from mislabeling procompetitive activity as per se illegal.

■ It is well established that a party "may choose with whom he will do business and with whom he will not do business," and that this behavior, referred to as "exclusive dealing," will not give rise to liability absent a showing of actual competitive injury. *Construction Aggregate Transp., Inc. v. Florida Rock Indus., Inc.*, 710 F.2d 752, 772–73 (11th Cir.1983). When, however, a party goes beyond a unilateral choice and agrees "with other [parties] to deal or not to deal" with some specific party, the legal consequences are

---

**32.** As the Supreme Court has explained, "[p]er se rules thus require the Court to make broad generalizations about the social utility of particular commercial practices." *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 n. 16, 97 S.Ct 2549, 2557 n. 16, 53 L.Ed.2d 568 (1977).

**33.** To date, the rule of per se illegality has been applied to four categories of restraints: horizontal and vertical price fixing, *see United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct.

811, 84 L.Ed. 1129 (1940); *Dr. Miles Medical Co. v. John D. Park & Sons*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), horizontal market divisions, *see Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951), group boycotts or concerted refusals to deal, *see Fashion Originators' Guild, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941), and tying arrangements, *see Northern Pac. Ry.*, 356 U.S. at 1, 78 S.Ct. at 514.

much different. *Id.* at 773. Such an agreement between independent parties is known as a "concerted refusal to deal." Many times concerted refusals to deal are subject to the per se rule of illegality. *Id.; see also, e.g., Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961) (per curiam); *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild, Inc. v. FTC*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

▉ Concerted refusals to deal that have been treated as per se illegal are generally termed "group boycotts"; this designation describes a situation where two or more parties have agreed that each of them will "refus[e] to deal with a particular customer or customers." *Construction Aggregate Transp.*, 710 F.2d at 773. Thus, the distinguishing feature of such cases is a plurality of refusals to deal by different parties. *Compare Radiant Burners*, 364 U.S. at 658–60, 81 S.Ct. at 366–67 (refusal by association comprised of gas companies and gas burner manufacturers to sell gas to purchasers of plaintiff manufacturer's gas burner was illegal per se as group boycott) *and Klor's*, 359 U.S. at 212–13, 79 S.Ct. at 709–10 (agreement by manufacturers to sell only to defendant department store and not plaintiff department store constituted group boycott) *and Fashion Originators' Guild*, 312 U.S. at 465–66, 61 S.Ct. at 706–07 (refusal by manufacturers of textiles and original design dresses to sell to retailers purchasing "copycat" designs from competing manufacturers constituted illegal group boycott) *with Construction Aggregate Transp.*, 710 F.2d at 772–74 (agreement between parties that resulted in one refusal to deal would only merit rule-of-reason analysis) *and Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 426–28 (5th Cir. Unit A July 1981)[34] (manufacturer's agreement with one dealer not to sell to other dealer did not constitute group boycott) *and Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004–07 (5th Cir. Unit A Feb.) (conspiracy between manufacturer and distributors not to deal with plaintiff distributor did not constitute group boycott), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981) *and Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131–32 (2nd Cir.) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978) *and Packard Motor Car Co. v. Webster Motor Car Co.*, 243 F.2d 418, 420–21 (D.C.Cir.), *cert. denied*, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957).[35]

In count two of their complaint, the plaintiffs allege that, pursuant to an agreement with LJS, M–B refused to deal with them. LJS is not in the business of storing or delivering supplies; it relies on M–B to perform these services for it. Thus, M–B's refusal to provide them to the plaintiffs as well only amounted to one party's refusal to deal with the plaintiffs; LJS did not refuse to provide these services to the plaintiffs. "That [LJS] may have instigated [M–B's] refusal to deal does not create the plurality of 'refusals' necessary for the arrangement to be called a group boycott." *Construction Aggregate Transp.*, 710 F.2d at 773. Rather, the alleged arrangement more closely resembles a unilateral refusal to deal. Because of this, we must analyze this claim under the rule of reason.

▉ In addition to the fact that the conduct alleged in count two does not constitute a classic group boycott, a separate analytical reason persuades us to evaluate this case under the rule-of-reason standard. This reason centers on whether the alleged restraint is horizontal or vertical in nature. *See generally Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54–59, 97 S.Ct. 2549, 2559–62, 53 L.Ed.2d 568 (1977) (describing the procompetitive effects of vertical restraints). Horizontal combinations are agreements among competitors;

---

**34.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**35.** Most of these citations come from the discussion in *Construction Aggregate Transp.*, 710 F.2d at 773–74.

these agreements generally restrain trade at the same level of distribution. *Construction Aggregate Transp.*, 710 F.2d at 774. Vertical combinations, on the other hand, are agreements between firms occupying different levels in the chain of distribution of a specific product. *Id.;* R. Bork, The Antitrust Paradox 288 (1978). "As such, the effect of a purely vertical restraint will be to restrain competition at a level other than that from whence the restraint was initiated." *Construction Aggregate Transp.*, 710 F.2d at 774.

■ The Supreme Court has made it clear that the scope of per se illegality is narrow with regard to vertical restraints. Indeed, vertical restraints are subject to the rule-of-reason standard, not per se illegality, unless they include "some agreement on price or price levels." *Business Elecs.*, 485 U.S. at 734, 108 S.Ct. at 1525; *see also GTE Sylvania*, 433 U.S. at 58–59, 97 S.Ct. at 2561–62. Horizontal restraints are more likely to be fitted with per se illegality. For instance, "[o]ne of the classic examples of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *see also Klor's*, 359 U.S. at 207, 79 S.Ct. at 705; *Fashion Originators' Guild*, 312 U.S. at 457, 61 S.Ct. at 703. Thus, we only treat an alleged agreement as per se illegal if it is a vertical price-fixing conspiracy, or otherwise directly affects price, or if it is a horizontal conspiracy that has presumptively anticompetitive effects.

■ The agreement alleged by the plaintiffs in count two is between a supplier and its distributor; this is a classic vertical arrangement. It is clear that the plaintiffs have not alleged that LJS and M–B agreed to institute restraints that are related directly to price. Thus, the agreement alleged should not be characterized as per se illegal. Furthermore, the plaintiffs in this action have made no serious attempt to portray the agreement between LJS and M–B as a horizontal, rather than a vertical, restraint on trade. Indeed, such an attempt would prove fruitless; LJS and M–B are not competitors at any level of distribution, and there is no allegation in count two that the apparently vertical agreement between LJS and M–B is actually a facade for some horizontal agreement among LJS or M–B and their competitors to restrain trade. We accordingly find that this claim must be analyzed under the rule-of-reason standard.[36]

2.

■ The rule of reason asks whether, in the circumstances of the case, a restrictive practice imposes "an unreasonable restraint on competition." *GTE Sylvania*, 433 U.S. at 49, 97 S.Ct. at 2557; *see also Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).[37] A restraint is unreasonable if it has an adverse impact on competition and cannot be justified as a procompetitive measure. *Consultants & Designers*, 720 F.2d at 1562. As we stated in *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir.1978): "[T]he rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit or justification."

For purposes of discussion, we will assume that M–B and LJS agreed that M–B

---

**36.** *See* H. Hovenkamp, Economics and Federal Antitrust Law 280 (1985) ("The courts' general refusal to apply the *per se* rule to concerted refusals by noncompetitors is wise: agreements between firms that do not compete are far less likely to be anticompetitive than agreements of competitors.").

**37.** In applying the rule of reason, the factfinder takes into account

the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; [and] the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. *Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

would refuse to deal with the plaintiffs and that M–B carried out its part of the bargain.[38] What we must decide, then, is whether this agreement had an adverse impact on competition. The burden of proving such an unjustified anticompetitive effect is on the plaintiffs. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 380 (5th Cir.1977).

The plaintiffs argue that LJS and M–B's agreement adversely impacted the market for sales of supplies to franchisees. Economic analysis of the operation of this market, however, reveals the irony of the plaintiffs' claim: it was not the anticompetitive impact of illegal activity, engaged in by LJS and M–B, that drove the plaintiffs from this market; rather, competition forced them out—LJS and M–B took procompetitive steps, and the plaintiffs simply could not keep pace.[39]

To the franchisees, the total cost of cod for their shoppes is a function of several component costs.[40] First, there is the price that their wholesale cod distributor, like LJS, Seagood, or Falcon, charges for the cod. This price represents the distributor's cost of operation plus a reasonable return on its investment. Included in the distributor's price are the costs associated with: purchasing the cod from its suppliers; storing the cod, as inventory, before delivery to the franchisees; financing maintenance of such inventory; and delivering the cod to the franchisees.[41] Second, the total cost of cod to the franchisees reflects the costs they incur in storing the cod at their shoppes and in maintaining such inventory.

In addition, the franchisees incur costs associated with unreliable deliveries or imprecise ordering; these costs may manifest themselves in the form of lost customers when, for example, a franchisee is unable to furnish a meal to a customer because of a lack of supply. The franchisees establish the price they charge the consuming public for their meals after considering their total cost of operation; they pass on their costs to the public. Of course, if their competitors have lower operating costs and can offer food to the public for lower prices, the franchisees will be unable to compete profitably with them; thus, the franchisees must operate as efficiently as possible if they want to remain competitive.

As explained above, every wholesale distributor, in setting the price for its cod, passes on the costs it incurs in operating its business. In effect, each distributor offers the franchisees a package. The only constant in every package is cod approved for use in LJS shoppes; everything else is negotiable. LJS, for example, offers franchisees weekly delivery service by M–B; LJS' competitors offer monthly delivery service. This means that LJS spends more money storing, maintaining, and delivering the cod than its competitors. This also means that LJS charges franchisees more for its services than its competitors charge. The franchisees who purchase cod from LJS, however, spend less money storing and maintaining the cod at their shoppes than those who purchase cod from LJS' competitors. The different packages, then, simply shift the initial burden of bearing

**38.** There is evidence in the record to support this assumption. As the district court observed, the record contains evidence indicating that: high-level officials at M–B and LJS had continual contact; M–B, on more than one occasion, conferred with LJS before deciding to reject competitors of LJS as clients; and M–B performed services for LJS that it did not perform for all of its clients and these services could be used to further anticompetitive goals. As noted in the text *supra,* the district court rejected the plaintiffs' count two claim on the ground that M–B's refusal to deal, even if pursuant to an agreement with LJS, constituted procompetitive conduct immune from the antitrust laws.

**39.** The district court analyzed the anticompetitive impact of the agreement between LJS and

M–B by looking at the market for restaurant delivery services. The plaintiffs contend that this is the wrong relevant market; as stated above, they urge us to examine this issue in the market for sales of supplies to LJS franchisees. Without passing on the validity of the district court's ruling, we will use the plaintiffs' definition of the relevant market.

**40.** As noted earlier, cod is the staple of the shoppes' menu, and the ability to sell cod to the franchised shoppes is the principal issue in this action. *See supra* note 20.

**41.** The distributors may pass on other costs to the franchisees as well, such as advertising and promotional expenses.

these costs between distributors and franchisees; in the end, though, the franchisees always pay for these costs, either directly or indirectly.

To illustrate, assume that cod supplied to LJS and its competitors in week one will not be used until week five. This means that the cod must be stored for five weeks, including the week in which it will be used. Under LJS' package, LJS would store and maintain the cod for the shoppes through week four and then deliver the cod; the shoppes would store and maintain the cod during the last week, when it would be sold to the public. On the other hand, LJS' competitors would store and maintain the cod for only one week before delivering it to the franchisees; the franchisees would have to store and maintain the cod for the remaining four weeks.

There are several benefits in LJS' package for the franchisees. These benefits spring from the size of LJS' operation—LJS owns and operates 880 shoppes and services most of its franchisees' shoppes—which produce economies of scale. Because of its size, LJS can spread the costs associated with storing and maintaining cod over countless transactions, reducing the cost of each transaction. Individual franchisees, because of their smaller size, cannot replicate LJS' cost savings. Thus, they spend more to store and maintain a case of cod at their shoppes than LJS spends to store and maintain the cod at M–B's warehouses. The same holds true for LJS' competitors; they cannot match LJS' economies of scale and the attendant cost savings. Consequently, LJS is able to charge the franchisees less than its competitors could charge them to store and maintain the cod.

LJS' delivery service is also less expensive. M–B, as explained above, is a highly efficient deliverer; this efficiency is heightened due to LJS' size. Furthermore, M–B provides more reliable delivery service, on the whole, than other deliverers, *see supra* note 8; this reliability also translates into cost savings for LJS. Thus, LJS is able to charge the franchisees less than its competitors could charge them for the weekly delivery of cod.

LJS takes advantage of the edge it has over its competitors—economies of scale and M–B's efficient delivery service—by passing its savings on to the franchisees. This is done through the price LJS offers the franchisees for its package. LJS bears the initial costs of storing and maintaining the cod for the franchisees and delivers this cod to them each week. In return, of course, LJS is paid; this price is higher than the price charged by LJS' competitors, but, overall, it represents a cost savings to the franchisees. In other words, it would cost the individual franchisee more if, instead of purchasing LJS' package, it purchased cod from LJS' competitors and then stored and maintained this cod at its shoppe. Since LJS pays less than the franchisees or its competitors to store and maintain a case of cod, and the cost of weekly delivery by M–B is low, it makes sense for the franchisees to contract with LJS to have it perform these tasks for them.

Indeed, a study of the market shows that the franchisees recognized the benefits of LJS' package and capitalized on it. LJS garnered a large share of the market for sales to franchisees during the market's formative stages. LJS maintained its dominance of this market in the late 1970s and early 1980s by adding M–B's services to its package. Other distributors were unable to emulate this package and thus could not compete with LJS; their overtures towards M–B were rejected, and without M–B's efficient and effective delivery service, LJS' competitors could not offer the franchisees an attractive enough package to cut into LJS' market dominance. LJS' continued success, however, depended on its ability to keep the total cost to franchisees of using its package below the total cost they would incur if they used a competitor's package.

As explained above, LJS, until the early 1980s, sold only Scandinavian cod. Once QCP began selling the cheaper Canadian cod, LJS' share of the franchisee market diminished. Apparently, the difference in price between Scandinavian cod and Cana-

dian cod was great enough to make QCP's package more economical for the franchisees, even though they had to store and maintain the cod themselves. LJS, of course, reacted to this change in the market. It outbid QCP and its other competitors for the cod packaged by Caribou and the other large Canadian suppliers; LJS' size allowed it to offer more money than its competitors bid for this cod because it could absorb the difference and continue to compete effectively.

Because it was now offering Canadian cod exclusively, LJS was able to lower the price of its package. Its overall market share, however, had diminished. This, in turn, had reduced the savings LJS could experience from economies of scale and also had impacted M–B's cost structure, making it less efficient. To compensate for these increased costs, the surcharge arrangement we have described was implemented. This increased the price of the package to the franchisees who cost LJS the most to service—the small purchasers; they were forced to choose between biweekly delivery service, thus increasing their storage and maintenance costs, or more expensive weekly delivery service. Even with this arrangement in place, however, LJS' package was more economical than its competitors' packages.

Indeed, LJS' competitors began to lose ground. While LJS was selling Scandinavian cod, its competitors, namely QCP, were able to compete successfully with it by selling cheaper Canadian cod. Now, although LJS, having lost a significant share of the market, had increased its cost of operation, it was selling the same Canadian cod that its competitors sold. Furthermore, LJS had outbid its competitors for this cod and thus was able to maintain a steady supply. LJS' competitors, on the other hand, were unable to secure enough of the Canadian cod to compete with LJS. Faced with this situation, LJS' competitors fared poorly; many were driven from the market. Seagood and Falcon countered LJS' competition by filing this suit.

The plaintiffs contended, in count two, that M–B's refusal to store and deliver the plaintiffs' cod in the same warehouses and trucks they used to service LJS constituted an illegal refusal to deal. This decision, they concluded, was the product of an illegal conspiracy between LJS and M–B designed to restrain trade and has had an anticompetitive impact in the market in which they compete. The plaintiffs, in their briefs to us, explain their position as follows:

> The denial of M–B's services to LJS' wholesale competitors ... further slanted the field of competition in LJS' favor.... It was not economically feasible for LJS' competitors to emulate M–B's weekly delivery service, which was predicated on the high volume of scores of other products being sold by LJS to its franchisees. Because of the enormous inconvenience to franchisees of having to receive competitors' products less frequently, the franchisees ... required that the competitors price below LJS....[42]

This argument reveals the heart of the plaintiffs' claim: they want the right to benefit from LJS' economies of scale. The plaintiffs are seeking a "free ride"—since they do not have a large enough operation to produce significant economies of scale and are unable, or unwilling, to finance the growth necessary to achieve these economies, they want to use, to their benefit, LJS' size and the capital outlays used to achieve it. The plaintiffs then could offer the franchisees a package similar to LJS' package. That would allow the plaintiffs to compete with LJS because LJS would no longer have a competitive advantage over them.

■ Explained in this way, it is clear that the plaintiffs' claim must fail. The plaintiffs have not been prevented from obtaining every storage or delivery service available in the market. M–B is but one provider in the enormous market for res-

---

**42.** The plaintiffs also described their position as follows: "Martin–Brower provided LJS with a competitive advantage not shared by its wholesale competitors."

taurant delivery services.[43] For a price, the plaintiffs could hire a different deliverer and emulate the service LJS and M–B provide for the franchisees. However, as the plaintiffs' experiences teach us, they could not provide such services to the franchisees at as low a price as LJS does because they do not have the same economies of scale. The plaintiffs then are asking us to equip them with LJS' competitive advantage.[44] This is not a function of the antitrust laws. The antitrust laws are not intended to support artificially firms that cannot effectively compete on their own. It is only when the market is being distorted by anticompetitive conduct that the antitrust laws should be invoked. *See, e.g., Scranton Constr. Co. v. Litton Indus. Leasing Corp.*, 494 F.2d 778, 782–83 (5th Cir.1974) (the Sherman Act is not a "panacea for all business affronts which seem to fit nowhere else"), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975).

■■■ For these reasons, we conclude that M–B's refusal to store and deliver the plaintiffs' cod, even if made in concert with LJS, had no anticompetitive impact in the market for the sale of food to franchisees. The plaintiffs were simply inhibited from competing in one way with LJS; they were forced to offer packages different from LJS' to try to compete. Most franchisees preferred LJS' package and chose to purchase it instead of the plaintiffs' packages. It is a harsh reality that when competition occurs, some win and some lose.[45] Emerging victorious from competition, however, is not illegal under the Sherman Act. To hold otherwise would require us to interpret the Sherman Act as mandating cooperation among rivals. We will not do so. We

therefore affirm the district court's grant of summary judgment as to count two of the complaint.

### B.

Seagood and Falcon also appeal the district court's grant of summary judgment in favor of M–B on count six of the complaint. As discussed above, this claim is that the activity alleged in counts one through five of the complaint, taken together, makes out independent violations of sections 1 and 2 of the Sherman Act because it establishes a scheme designed by LJS "to limit unreasonably the extent of competition for the sale to its franchisees of approved cod." The district court concluded that the plaintiffs had failed to demonstrate a genuine issue of fact as to M–B's membership in this conspiracy. The plaintiffs argue that the district court came to this conclusion because it misapplied the law. We disagree and accordingly affirm the district court's judgment.

■■■ The threshold requirement of every conspiracy claim, under both section 1 and section 2, is an agreement to restrain trade. To prove that such an agreement exists between two or more persons, a plaintiff must demonstrate "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). We recognize that it is only in rare cases that a plaintiff can establish the existence of a conspiracy by showing an explicit agreement; most conspiracies are inferred from the behavior of the alleged conspirators.

---

**43.** According to M–B's expert, M–B's share of the market for restaurant delivery services was merely 2.4% in 1984. This gave M–B the second largest share of this market; the largest firm had only a 3.2% share of the market.

**44.** Not only do the plaintiffs seek the benefits of LJS' capital outlays, they seek these benefits for free. The plaintiffs are not offering to pay LJS for its investment; instead, they want to use M–B's services at the same price LJS pays for them. This would result in a windfall for the plaintiffs at LJS' expense—the plaintiffs would get all of the benefit without any of the cost.

**45.** As Judge Easterbrook eloquently put it: "Who says that competition is supposed to be fair, that we judge the behavior of the marketplace by the ethics of the courtroom? Real competition is bruising rivalry, in which people go out of business under intense pressure.... [C]ompetition is a 'gale of creative destruction.'" *Fishman v. Estate of Wirtz*, 807 F.2d 520, 577 (7th Cir.1986) (Easterbrook, J., dissenting).

*DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1515 (11th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990). Antitrust law, however, limits the range of inferences that may be drawn from circumstantial evidence to prove an unlawful conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). To make out a conspiracy, and thus survive a motion for summary judgment, the circumstantial evidence must reasonably "tend[ ] to exclude the possibility" that the alleged conspirators acted independently. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984). This means that "conduct as consistent with permissible [activity] as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356. For example, the mere opportunity to conspire among antitrust defendants does not, standing alone, permit the inference of conspiracy. *Bolt v. Halifax Hosp. Medical Center*, 891 F.2d 810, 827 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1960, 109 L.Ed.2d 322 (1990). Thus, when the defendant puts forth a plausible, procompetitive explanation for his actions, we will not be quick to infer, from circumstantial evidence, that a violation of the antitrust laws has occurred. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1456 (11th Cir.1991).

▌ In this case, Seagood and Falcon have presented no direct evidence that M–B was a member of the alleged conspiracy among LJS and its cod suppliers. Rather, they rely on several pieces of circumstantial evidence. This evidence falls into two categories and, according to the plaintiffs, indicates the following: that M–B had knowledge of the conspiracy among LJS and its cod suppliers, and that armed with this knowledge, M–B joined that conspiracy.

To show that M–B had knowledge of the conspiracy among LJS and its cod suppliers, the plaintiffs first presented evidence

showing that LJS and M–B agreed that M–B would refuse to deal with the plaintiffs, *see supra* note 38; M–B's subsequent refusal to deal, however, as we point out in part II.A, was procompetitive and thus lawful. Next, they presented evidence indicating that M–B suggested that LJS adopt the surcharge arrangement, that M–B tracked cod usage by the franchisees and kept LJS abreast of their purchases of cod from LJS' competitors, and that M–B suggested that LJS give franchisees who were buying from LJS priority for cod supplies in the event of a cod shortage. This conduct, considered as a whole, was not unlawful— indeed, the plaintiffs have not alleged that it violated the law.

From this circumstantial evidence, the plaintiffs then drew the following inferences:

> M–B certainly had reason to know that LJS' denial of M–B's services to the competition, while giving LJS an unfair advantage and enabling LJS to recapture a major amount of lost business, was not by itself enough to thwart the competition.... M–B therefore had reasons to believe that LJS' anticompetitive scheme extended beyond keeping M–B to itself....
>
> ... M–B knew what the main goal of the conspiracy was and shared that goal, knew that the conspiracy extended beyond its own conduct with LJS, and knew that the cod packers selling to LJS were being favored by LJS[ ]....

In sum, the plaintiffs' argument is that the foregoing circumstantial evidence gives rise to three inferences. First, M–B, because LJS asked it not to deal with the plaintiffs, knew that LJS intended, through unlawful means (one of these means being M–B's refusal to deal), to drive them out of business. Second, M–B knew that its refusal to deal would not accomplish LJS' objective. Third, for this reason, M–B knew that LJS, in concert with its cod suppliers, would have to use other unlawful means to drive the plaintiffs out of the market.[46]

---

**46.** According to the plaintiffs, M–B also knew that some of LJS' franchisees, namely S & S,

The plaintiffs contend that M–B, with full knowledge of this scheme, joined, and participated in, the conspiracy among LJS and its cod suppliers. Two additional pieces of circumstantial evidence supposedly make this final inference clear: M–B regularly ordered cod on LJS' behalf, and once, in 1984, it attended a meeting at which representatives of LJS and its cod suppliers were present.

The plaintiffs' ultimate, and indispensable, inference—that M–B conspired with LJS and its cod suppliers—fails for two reasons. First, it cannot reasonably be inferred that M–B knew that a conspiracy among LJS and the cod suppliers was afoot, the object of which was to drive the plaintiffs out of business with unlawful means. To conclude, on this record, that M–B possessed such knowledge would be to engage in rank speculation. Without this inference, the fact that M–B ordered cod for LJS and once attended a meeting with it and the cod suppliers is of no moment.

Second, even if we were to indulge the inference that M–B knew of the supposed LJS/cod suppliers conspiracy, we would still conclude that the plaintiffs failed to produce evidence of M–B's membership in the conspiracy sufficient to withstand M–B's motion for summary judgment. The uncontradicted evidence in the record establishes that low-level workers at M–B, acting as LJS' agents, periodically placed cod orders with low-level workers for the suppliers; such conduct on their part hardly indicates that their principals intended to conspire as alleged in count six. M–B's attendance at the 1984 meeting likewise fails as proof that M–B intended to conspire with LJS and the cod suppliers. LJS convened the meeting for the purpose of examining the quality of some of the cod it had purchased from its suppliers, LJS' alleged coconspirators. M–B's role at the meeting was limited to pulling some samples of cod from LJS' inventory for testing. This meeting took place almost eighteen months after the complaint in this case was

had joined the LJS/cod suppliers scheme. This inference cannot reasonably be drawn from the

filed. The meeting thus constituted no proof that during the period of time described in the complaint, from 1977 to 1982, M–B and the cod suppliers conspired as alleged. In their principal brief to us, the plaintiffs say that this piece of evidence was offered "merely to show communication and opportunity to conspire." It is well settled, however, that mere evidence of an opportunity to conspire, standing alone, will not support an inference of antitrust conspiracy. *See, e.g., Bolt*, 891 F.2d at 827.

We therefore conclude that the circumstantial evidence in this case is insufficient to implicate M–B in an unlawful conspiracy involving LJS and its cod suppliers. The most the plaintiffs have shown is an agreement between LJS and M–B, pursuant to which M–B refused to deal with the plaintiffs, as alleged in count two; this is not enough to make out a case of liability against M–B in count six. The district court's summary rejection of that count was thus appropriate.

### C.

The final issues the plaintiffs raise involve claims that, they argue, the district court did not recognize or address. According to the plaintiffs, the district court failed to recognize a tie-in claim against M–B in count two of the complaint and a conspiracy to monopolize claim in count six. We disagree and thus conclude that the district court properly dismissed M–B from this action.

### 1.

█ We first address the plaintiffs' argument that the district court failed to consider their claim, in count two, that M–B conspired with LJS to further LJS' tying arrangement in violation of section 1 of the Sherman Act. The plaintiffs argue that they raised this claim in count two of their complaint. After studying the plead-

record before us.

ing, we find that the plaintiffs did not raise such a claim.

Rule 8(a)(2) of the Federal Rules of Civil Procedure mandates that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Under this process, called "notice pleading," the complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Quality Foods v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.1983) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). Notice pleading does not mean, however, that a complaint need not be drafted in "a careful and thoughtful fashion.... [E]nough data must be pleaded so that each element of the alleged antitrust violation can be properly identified." *Id.* (citation omitted). It is well settled that notice pleading is all that is required for a valid antitrust complaint. *Id.*

Count two of the plaintiffs' complaint, entitled "Antitrust Violation—Refusal to Deal," does not mention a tie-in claim against M–B. The plaintiffs argue, however, that they incorporated several paragraphs from count one (the tie-in claim against LJS) into count two and that this notified M–B that count two also alleged a tie-in claim against it. The paragraphs they incorporated mostly involve factual allegations concerning the way in which LJS operated its business. The final paragraphs they incorporated alleged the manners in which trade was restrained by LJS' tying arrangement, the ways LJS achieved these restraints, and the anticompetitive purposes of LJS' conduct. In none of these paragraphs is M–B mentioned by name. Thus, it appears to us that the most reasonable reading of count two is that M–B and LJS agreed that M–B would refuse to deal with the plaintiffs and that this agreement would restrain trade in the same way LJS had restrained trade through its tying arrangement and for the same purposes. We do not agree that count two notifies M–B that the plaintiffs intended to assert a tie-in claim. Thus, we find that the district court considered every claim the plaintiffs

presented in count two, and we hold that it properly disposed of this count.

2.

The plaintiffs also argue that the district court's disposition of the count six claim against M–B did not address the merits of the allegation in count six that M–B participated in a conspiracy to monopolize the market for purchasing cod in violation of section 2 of the Sherman Act. This argument is also without merit.

To establish a conspiracy to monopolize, a plaintiff is required to prove: (1) concerted action deliberately entered into with the specific intent of achieving a monopoly; and (2) the commission of at least one overt act in furtherance of the conspiracy. L. Sullivan, Handbook of the Law of Antitrust 132–34 (1977); *see also American Key Corp. v. Cole Nat'l Corp.*, 762 F.2d 1569, 1579 n. 8 (11th Cir.1985). Thus, a section 1 claim and a section 2 conspiracy to monopolize claim require the same threshold showing—the existence of an agreement to restrain trade. *See* R. Posner, Antitrust Law: An Economic Perspective 216 (1976) ("As for conspiracy to monopolize, any such conspiracy is also a conspiracy in restraint of trade, which violates section 1."). After this showing is made, then the plaintiff is required, under section 2, to show that the conspiracy was formed with the specific intent to obtain or maintain a monopoly.

In this case, the district court held that the plaintiffs had failed to demonstrate a genuine issue of fact as to M–B's membership in a conspiracy among LJS and its cod suppliers. This holding is equally applicable to the section 2 conspiracy claim against M–B. The plaintiffs offered no additional evidence to show M–B's membership in this conspiracy; indeed, this conspiracy is based on the same factual allegations as the section 1 conspiracy. We thus hold that the district court committed no error in disposing of the plaintiffs' count six claim against M–B.

### III.

In sum, we hold that the district court properly granted summary judgment in favor of M–B on counts two and six of the complaint. First, with respect to count two, M–B's refusal to deal with the plaintiffs, even if at the urging of LJS, had no anticompetitive impact. Indeed, the refusal was motivated by procompetitive considerations. Since this claim is properly analyzed under the rule-of-reason standard, we must conclude that the challenged activity was lawful.

The plaintiffs' claim in count six also must fail. The plaintiffs have failed to raise a genuine issue of fact as to M–B's membership in a conspiracy among LJS and its cod suppliers. Thus, summary judgment in M–B's favor was proper.

Finally, we find that the district court considered all of the claims the plaintiffs presented against M–B in counts two and six. Contrary to the plaintiffs' protestations, count two does not allege a tie-in claim against M–B. Additionally, both of the plaintiffs' claims in count six were addressed by the district court; the rationale supporting the dismissal of the section 1 claim compels the dismissal of the section 2 claim.

The decision of the district court is, therefore, AFFIRMED.

IT IS SO ORDERED.