**UNITED STATES of America,**

v.

**GENERAL ELECTRIC COMPANY, et al.**

No. CR–2–94–019.

United States District Court,
S.D. Ohio,
Eastern Division.

Dec. 8, 1994.

Max L. Gillam, David A. Blotner, Arnold C. Celnicker, James T. Clancy, Joëlle A. Moreno, Melanie J. Sabo, Steven R. Beck, Attys., U.S. Dept. of Justice, Antitrust Div., Columbus, OH, for the U.S.

James E. Pohlman, Daniel W. Costello, Porter, Wright, Morris & Arthur, Columbus, OH, Dan K. Webb, Bradley C. Graveline, Lawrence R. Desideri, Thomas J. Frederick, Winston & Strawn, Chicago, IL, William J. Baer, David S. Eggert, Arnold & Porter, Washington, DC, Jeffrey B. Kindler, General Elec. Co., Fairfield, CT, Trial Counsel, for defendant General Elec. Co.

## OPINION AND ORDER

GEORGE C. SMITH, District Judge.

This is a criminal antitrust action brought under Section 1 of the Sherman Act. The government charges General Electric Company ("General Electric") with conspiracy to raise the list prices of its industrial diamonds with co-defendant DeBeers Centenary AG ("DeBeers"), in violation of 15 U.S.C. § 1 and 18 U.S.C. § 2. This matter is before the Court on General Electric's motion for judgment of acquittal under Fed.R.Crim.P. 29. For the reasons that follow, the Court will grant General Electric's Rule 29 motion.

### I.

On February 17, 1994, the grand jury returned an indictment charging defendants General Electric, DeBeers, Peter Frenz, and Philippe Liotier with one count of conspiracy to raise prices in violation of Section 1 of the Sherman Act. General Electric is a United States corporation. A division of General Electric, General Electric Superabrasives ("GES"), manufactures industrial diamonds. GES is located in Worthington, Ohio.

DeBeers is a Swiss corporation known for mining and distributing gemstone diamonds worldwide. DeBeers, through various affili-ates, also manufactures industrial diamonds. Thus, DeBeers is in direct competition with General Electric's GES division. General Electric and DeBeers dominate the world industrial diamond manufacturing market.

GES and DeBeers manufacture both saw diamonds and polycrystalline diamonds ("PCD"). Saw diamond is manufactured and sold in single crystal form. Diamond tool manufacturers bond the saw diamond to the cutting edges of industrial saw blades. These blades are used for a variety of purposes, such as stone cutting. General Electric calls its saw diamond products Metal Bond Sawing ("MBS"). DeBeers uses the name Saw Diamond Abrasive ("SDA") for its saw diamonds.

There are two types of PCD products: compacts and drilling products. Compacts are made by bonding diamonds to a tungsten carbide base. General Electric uses the name Compax for its compacts products. DeBeers calls its compacts products Syndite.

Drilling products are also made by bonding diamonds to a tungsten carbide base. These products are then incorporated into drill bits used for oil drilling and mining. General Electric uses the name Stratopax and Geoset for its drilling products. DeBeers calls its drilling products Syndrill.

Peter Frenz manages GES Europe, a wholly-owned subsidiary of General Electric that sells GES's industrial diamond products throughout Europe. Frenz lives in Germany.

During 1991, Philippe Liotier was the managing director of Diamant Boart, a Belgian company that manufactures and sells tools made with industrial diamonds. Diamant Boart buys industrial diamonds from General Electric [1] as well as DeBeers. Another Belgian company, Sibeka, owns Diamant Boart. Sibeka and DeBeers are engaged in a 50/50 joint venture called Ultra High Pressure Units ("UHPU"). UHPU manufactures industrial diamonds. Another Belgian company, Société Générale de Belgique ("Société Générale"), owns Sibeka. DeBeers owns almost 20% of Société Générale. During the

---

1. The evidence shows that in 1991 Diamant Boart bought about $13 million in industrial diamonds from GES, and was GES's largest European customer.

relevant period Liotier held positions with Sibeka and Société Générale in addition to his position as managing director of Diamant Boart.

The indictment charges that defendants conspired to raise the list prices of industrial diamonds in 1991 and early 1992. GES and DeBeers raised the prices of their industrial diamonds in early 1992. This was the first market-wide increase in the list prices of industrial diamonds in nearly five years. In late 1991 and early 1992, before the price increases were publicly announced or took effect, Liotier provided Frenz advance list pricing information about DeBeers' planned price increase. Similarly, Frenz provided Liotier advance list pricing information about GES's planned price increase.

The government asserts that Frenz and Liotier exchanged the advance pricing information in furtherance of the alleged conspiracy. General Electric maintains the exchange of information between Frenz and Liotier was lawful because Liotier was acting on behalf of Diamant Boart, a GES customer.

Three of the named defendants in this case—DeBeers, Peter Frenz, and Philippe Liotier—were, and remain, beyond the territorial jurisdiction of this Court. After extensive pretrial motions practice, this matter proceeded to trial against General Electric beginning on October 25, 1994. Over a period of about five weeks, the government called numerous witnesses to testify in its case. The government's trial witnesses included past and present GES employees,[2] employees of Diamant Boart,[3] GES's and DeBeers' customers, and others associated with the industrial diamond market.

Edward Russell was among the former GES employees who testified for the government. In 1986, General Electric promoted Russell to the position of vice president in charge of GES. He held that position until November 11, 1991, when General Electric terminated his employment. In early 1992, Russell contacted the government, alleging

that General Electric employees had committed various acts of wrongdoing, including antitrust violations. Russell's allegations set into motion the government investigation that led to this case. Russell personally participated in the government's investigation.

Soon after contacting the government, Russell filed a civil wrongful termination action against General Electric. He alleged that General Electric fired him because he was a whistleblower. Russell settled his wrongful termination suit against General Electric on February 16, 1994, one day before the grand jury handed down the indictment in the instant case. Russell was a key witness for the government.

The government rested its case on November 22, 1994. General Electric filed its motion for judgment of acquittal under Fed. R.Crim.P. 29 on November 23, 1994. The government filed its response on November 30, 1994. The Court heard oral argument on the Rule 29 motion on December 1, 1994. Both parties filed additional memoranda and papers on the Rule 29 motion, providing some of them to the Court over the weekend of December 3 and 4, 1994.

## II.

The standard for addressing a motion for judgment of acquittal under Fed. R.Crim.P. 29 is the same as the standard for reviewing a claim that evidence is insufficient to support a conviction. *United States v. Abner*, 35 F.3d 251, 253 (6th Cir.1994).

In reviewing claims for sufficiency of the evidence to support a conviction, this court, while reviewing the record in the light most favorable to the prosecution, should grant relief only if it is found that upon the record evidence adduced at trial, no rational[4] trier of fact could have found proof of guilt beyond a reasonable doubt.

---

2. For example, present GES employee Stephen Palovchik, former GES employee Mark Harnden, and present GES Europe employee Volkmar Murer,

3. Carl Roemmele and James Whitehead.

4. The term "rational" in this context means a trier of fact applying logic and reason as opposed to passion or prejudice.

*Id.* (citing *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979)).

> "A defendant claiming insufficiency of the evidence bears a very heavy burden. On review, all of the evidence must be construed in a manner most favorable to the government. Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt."

*Id.* (quoting *United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.), *cert. denied,* 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986)).

▪ In addressing a Rule 29 motion, the Court may not make credibility determinations, and may not weigh the evidence. *United States v. Davis,* 981 F.2d 906, 908 (6th Cir.1992). The Court must give the prosecution "the benefit of all reasonable inferences drawn from the evidence, including circumstantial evidence." *Id.* Moreover, the Court must resolve any conflicts in the testimony in favor of the prosecution. *United States v. Tilton,* 714 F.2d 642, 645 (6th Cir. 1983). Hence, it is not enough for a defendant to establish there is some evidence in the record to support a finding of not guilty; rather, to prevail on a Rule 29 motion, the defendant must demonstrate that, when the evidence is viewed in the light most favorable to the government, no rational trier of fact could find the defendant guilty beyond a reasonable doubt.

▪ The standard, however, is not so heavily weighted in favor of the prosecution that in ruling on a Rule 29 motion the Court must blindly and uncritically accept that every inference the prosecution argues can reasonably be drawn from the circumstantial evidence in the record. Thus, a conviction may not be based solely on circumstantial evidence from which a trier of fact could infer facts tending to prove a defendant's

guilt, or facts tending to prove his innocence. *United States v. Leon,* 534 F.2d 667, 676–77 (6th Cir.1976). Stated otherwise, circumstantial evidence is insufficient to sustain a conviction if the trier of fact is called upon to choose between reasonable probabilities of equal weight, one innocent and the other guilty. *United States v. Campion,* 560 F.2d 751, 753–54 (6th Cir.1977). This concept does not require the Court to weigh the evidence. Rather, it is consistent with the principles that only *reasonable* inferences may be drawn in the prosecution's favor, *Davis,* at 908, and that the evidence, viewed in the light most favorable to the prosecution, must support a finding of guilt *beyond a reasonable doubt, Abner,* at 253.

## III.

General Electric asserts three arguments in support of its motion for judgment of acquittal: (1) there is insufficient evidence that Philippe Liotier acted on DeBeers' behalf and that General Electric knew this; (2) there is insufficient evidence of a price-fixing agreement; and (3) there is insufficient evidence to hold General Electric criminally liable for the conduct of its subsidiary. The Court concludes that the first issue is dispositive and therefore finds it unnecessary to reach the remaining two issues.

## IV.

General Electric argues that the government has failed to present sufficient evidence to support a finding that Philippe Liotier was acting on behalf of DeBeers and that General Electric knew this. General Electric maintains there is no direct evidence that Liotier was acting on DeBeers' behalf, and that the circumstantial evidence is insufficient as a matter of law.

▪ Over the government's objection,[5] the Court adopted the following jury instruction:

> Court's senior law clerk that it would do so during a final charge conference. The Court actually rejected both parties' versions of this instruction. General Electric's extensive version would have required the government to prove that DeBeers could be held criminally responsible for Liotier's actions. The government's version did not seek to avoid completely the require-

5. The Court required the parties to submit their proposed jury instructions well in advance of trial. The Court issued a preliminary draft of its instructions to counsel for both sides before the trial began. The Court's preliminary draft constituted the Court's ruling on the parties' requested instructions. The government never formally objected to this instruction, but indicated to the

The government has charged that Philippe Liotier acted on behalf of DeBeers in furtherance of the alleged conspiracy. To find that General Electric conspired with DeBeers, in addition to the elements I have already listed, you must find beyond a reasonable doubt that Philippe Liotier did, in fact, so act on behalf of DeBeers, and that General Electric knew this.

The government has introduced evidence concerning Philippe Liotier's alleged business relationship with DeBeers through his having served on the board of directors of corporations allegedly related to DeBeers. You are instructed that this evidence is not conclusive proof that Liotier acted on behalf of DeBeers in furtherance of the alleged conspiracy. Rather, you may consider this evidence, along with all of the evidence admitted in this case, in determining whether the government has proved beyond a reasonable doubt that Liotier acted on behalf of DeBeers in furtherance of the alleged conspiracy and that General Electric knew that Liotier was acting on behalf of DeBeers.

Jury Instructions p. 37. This is not an essential element of the government's case in the same sense as the existence of a price-fixing agreement.[6] Nevertheless, in light of the indictment, as well as the proof the government offered in its case, the government has obligated itself to prove this fact.[7] Most of the crucial inferences the government apparently seeks the trier of fact to draw from the evidence in its case would make no sense whatsoever if Liotier was merely General Electric's customer. General Electric cannot be held criminally liable for sharing advance pricing information with a customer. Stated otherwise, the government's conspiracy theory falls apart completely if Liotier was not acting on DeBeers' behalf.

The government does not cogently dispute General Electric's contention that there is no direct evidence to establish that Liotier was acting on DeBeers' behalf. The government maintains, however, that a rational trier of fact could infer this fact from circumstantial evidence it presented in its case. The government asserts four separate arguments to establish this element: (1) the corporate structure links Liotier with DeBeers; (2) Liotier's actions were consistent with DeBeers' interests; (3) Edward Russell's testimony shows that Liotier acted on DeBeers' behalf and that General Electric knew this; and (4) the documents and communications exchanged between Frenz and Liotier show that Liotier acted on DeBeers' behalf.

### A. Corporate Relationships

The parties have stipulated the corporate relationship between DeBeers, Sibeka,[8] Diamant Boart, and Philippe Liotier. Liotier sat on the board of directors of Sibeka.

---

ment that it had to prove that Liotier was acting on DeBeers' behalf. Rather, under the government's version the Court would have instructed the jury that the requirement was met as a matter of law on the basis of the corporate connections.

6. In one sense, however, this element is part and parcel of the element of the existence of a price-fixing agreement. The government charges General Electric with conspiracy to fix prices *with DeBeers*. Under the evidence adduced in the government's case, Liotier is the critical link to DeBeers; without him, the alleged agreement could not have existed.

7. *See* Indictment paras. 14 and 15. The Court is well aware that the government is not required to allege or prove any overt acts in a Section 1 Sherman Act case. *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224–25 n. 59, 60 S.Ct. 811, 846 n. 59, 84 L.Ed. 1129 (1940); *United States v. Miller*, 771 F.2d 1219, 1226 (9th Cir.1985). In the instant case, however, the government has both alleged and undertaken to prove the existence of a price-fixing agreement between General Electric and DeBeers based at least in part upon the circumstantial evidence of the manner in which Frenz and Liotier exchanged advance pricing information. If Liotier was not acting on DeBeers' behalf, it would be unreasonable to infer the existence of a price-fixing agreement with DeBeers from this evidence. This is true even if the evidence of the information exchange is considered along with Ed Russell's testimony that Frenz allegedly told him that Glen Hiner suggested to Etienne Davignon that Frenz and Liotier could work together to stabilize prices. This purported admission, even when viewed in the light most favorable to the government, could support or corroborate the existence of a price-fixing agreement only if Liotier was acting on behalf of DeBeers.

8. As General Electric notes, the indictment does not charge Sibeka with conspiracy to fix prices.

Three of the Sibeka directors represent De-Beers' interests. Sibeka has a 50/50 joint venture with DeBeers in the ownership of UHPU. UHPU is the manufacturing arm of DeBeers that makes industrial diamonds. DeBeers holds a 19.4% ownership interest in Sibeka. Liotier was also the managing director and a director of Diamant Boart, a wholly-owned subsidiary of Sibeka, and a director of Société Générale, the majority shareholder of Sibeka. Liotier's primary position at Société Générale was director in charge of industrial holdings and strategy. In that capacity, he reported to Viscount Etienne Davignon. Davignon also sat on the board of Minorco, another DeBeers affiliate, with Julian Ogilvie Thompson.[9]

■ The Court finds that even if this evidence is viewed in the light most favorable to the government, it is insufficient to support an inference that Liotier acted on DeBeers' behalf. At most, it shows that Liotier may have had the opportunity to see people from DeBeers who attended board of directors' meetings.[10] Absent from the record is any evidence that these corporate links were used by DeBeers or Liotier to form or facilitate an agreement with General Electric to fix list prices of industrial diamonds. If the record contained evidence that Liotier communicated with the DeBeers members of Sibeka's board of directors about fixing prices of industrial diamonds, then the Court's conclusion might be different. There is no such evidence in the record, however. As a result, the jury would be left to speculate that such discussions took place as a result of the corporate links. The Court therefore concludes that this evidence is insufficient to establish that Liotier acted on DeBeers' behalf.

## B. Liotier's Actions Consistent With DeBeers' Interests

The government also argues that a rational trier of fact could infer that Liotier was acting on DeBeers' behalf because his actions were consistent with DeBeers' interests.

### 1. Support of Diamond Price Increase

The government maintains that unless Liotier was acting on DeBeers' behalf, he would not have supported the diamond price increase. The government relies on the grand jury testimony of James Whitehead, a Diamant Boart employee who stated that only a masochist would want a price increase.[11]

■ As General Electric points out, however, it would be equally reasonable for a trier of fact to infer that Liotier was acting in Diamant Boart's best interests by supporting the price increase. First, there is no evidence that Liotier was given a choice about the price increase, and it would be entirely reasonable to infer that by "supporting" the increase he was merely making the best of a bad situation. Second, there is uncontroverted evidence that Diamant Boart was in a unique position to gain an advantage over its competitors as a result of the planned increase. The uncontroverted evidence shows that Rene Lorent of Diamant Boart had perfected a unique system of blending industrial diamonds to form a "cocktail," using a combination of less expensive diamonds with more expensive grades to achieve results that could otherwise be reached only by using more expensive diamonds. Unable to match this procedure, Diamant Boart's competitors would have found it more difficult to pass the cost of the price increase to their customers.[12]

9. Thompson is a prominent figure in the DeBeers organization.

10. *See Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1575 (11th Cir.1991) ("It is well settled, however, that mere evidence of opportunity to conspire, standing alone, will not support an inference of antitrust conspiracy"); *Cooper v. Forsyth County Hosp. Authority, Inc.*, 789 F.2d 278, 281 (4th Cir.1986) ("[F]ederal courts consistently have recognized that mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which to infer an anticompetitive

conspiracy"), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986).

11. This grand jury testimony is not substantive evidence, but was offered to impeach Whitehead's later testimony at trial that there were legitimate reasons for Liotier to support the proposed price increase.

12. The Court does not weigh this evidence, as it is uncontroverted. Rather, under the applicable standard, this evidence cannot be ignored in determining whether the inference the govern-

For these reasons, the Court finds that, even when viewed in the light most favorable to the government, Liotier's support of the proposed diamond price increase gives rise to equally weighted inferences, one that tends to establish the element of the government's case, and one that does not.

### 2. Sharing Information with Others at Diamant Boart

The government also contends that unless Liotier was acting on DeBeers' behalf he would have shared the advance pricing information with other Diamant Boart employees, and in particular with Rene Lorent. This raises the difficult issue of the government's unsuccessful attempt to prove a negative. The government tried, but was unable, to show that Liotier never gave the subject pricing information to anyone at Diamant Boart.

■ It was of particular importance, under the government's theory of the case, to prove that Rene Lorent did not receive the information. Lorent was in charge of purchasing and pricing at Diamant Boart. The government's syllogism was that if Lorent was not given the advance list pricing information, Liotier did not receive it for the benefit of Diamant Boart.[13] The government, however, was unable to secure an admissible statement from Lorent on this subject, and Lorent, who resides in Belgium, refused to travel to the United States to testify for the government at trial.

Undaunted, the government attempted to prove this point by offering the testimony of Belgian Judicial Police officers who searched Lorent's files in November 1993. The Court excluded this testimony, however, finding that the government had not laid a proper foundation to show either that Lorent was so situated that he would have received this information in the ordinary course of events, *Biggs v. Logicon, Inc.,* 663 F.2d 52, 54 (8th Cir.1981); 2 Wigmore, *Evidence,* § 664 (Chadbourn rev. 1979), or that Lorent would have retained the information until the date of the search as part of his regularly kept business records, Fed.R.Evid. 803(6) and (7).

In addition, there is uncontroverted evidence that at a Diamant Boart executive committee meeting held on December 4, 1991, Liotier did, in fact, openly share the general information that a price increase was going to occur. Also, it is uncontroverted that on November 13, 1991, Diamant Boart employee Carl Roemmele learned of the price increase from GES sales manager Stephen Palovchik, and that Roemmele sent Lorent a memo informing him of the anticipated percentage increases.

The Court finds that, even when this evidence is viewed in the light most favorable to the government, it does not support an inference that Liotier was acting on behalf of DeBeers rather than for the benefit of Diamant Boart.

### 3. Prices of PCD Products

The government also argues that Liotier must have been acting on DeBeers' behalf because he received information on PCD product prices, and Diamant Boart purchases an insignificant amount of these products.[14] The government's argument is flawed. Merely because Diamant Boart purchased only a relatively small amount of PCD products from General Electric, it does not logically follow that Liotier would have no legitimate interest in the prices of those products.

---

ment seeks to draw is reasonable and would support a finding of guilt beyond a reasonable doubt.

**13.** The government's theory is also flawed in that the record evidence does not demonstrate that Lorent would have been keenly interested in the subject preliminary list prices. The uncontroverted evidence shows that Lorent made his calculations from final net prices. The government argues essentially that prices are prices. The distinction between final net and preliminary list prices, however, is significant insofar as the government attempts to use Lorent's position to prove an element of its case. The Court cannot ignore this distinction in evaluating whether the inference the government seeks to have drawn is reasonable.

**14.** The government also argues that unless Liotier was acting on DeBeers' behalf, he would not have opposed the proposed two-week delay in implementing the compacts tooling price increase. As General Electric points out, however, there is no evidence in the record to support this assertion.

▮▮ The uncontroverted testimony of at least two government witnesses demonstrates that Liotier did, in fact, have legitimate reasons to receive PCD pricing information. James Whitehead, who worked under Liotier and eventually replaced him at Diamant Boart indicated that Diamant Boart was "acting, ... as an agent or merchant for the former drilling and service company that we sold to Baroid" and price changes on drilling products were important to Diamant Boart in 1992. He further testified that Diamant Boart was a customer for compacts and also had an idea of re-selling compacts products to its customers. Moreover, such information is important in analyzing competitors' costs. Mark Harnden, GES's drilling products manager in 1991–92, testified that Diamant Boart continued to purchase drilling products on behalf of Baroid between January and March 1992.

Furthermore, what Liotier *received* does not, in any event, create more than a very slight inference, if any. Receiving information is a passive act. It says little, if anything, about whether Liotier was acting on DeBeers' behalf.

The Court finds that Liotier's receipt of list pricing information for PCD products, even when viewed in the light most favorable to the government, does not reasonably support the inference that Liotier was acting on DeBeers' behalf.

### 4. Frenz's Failure to Provide Murer With Pricing Information

The government next argues that unless Liotier was acting on DeBeers' behalf, Peter Frenz would have given the advance pricing information to Volkmar Murer. Murer is GES Europe's sales manager responsible for Diamant Boart. He reports to Frenz. The Court fails to see, however, how the failure of Frenz, not Liotier, to do something helps to establish that Liotier was acting on DeBeers' behalf. This evidence, even when viewed in the light most favorable to the government, does not give rise to a reasonable inference that Liotier was acting on DeBeers' behalf.

### 5. Use of Information/Number of Meetings

The government also maintains that Liotier's actions, when viewed as a whole, show that he was acting on DeBeers' behalf. Specifically, the government asserts that other General Electric customers did not receive the same information as Liotier, and that Frenz and Liotier met frequently toward the end of 1991 and the beginning of 1992. With regard to the first assertion, GES sales manager Palovchik testified that he sent an advance price sheet to another GES customer, Mr. Moller of Diamond Products, on November 21, 1991. Furthermore, this is another instance of the government attempting to prove a negative without adequate evidence. The government has not affirmatively proved that no other General Electric customers ever received such information.

▮▮ With regard to the second assertion, the testimony of several government witnesses indicates that the meetings were for legitimate business purposes. There is no evidence from which it could reasonably be inferred that the meetings were for the purpose of price-fixing.[15] More significantly, however, the number of meetings is not so remarkable that it reasonably supports an inference that Liotier was acting on DeBeers' behalf.[16] In fact, the evidence indicates that communications between suppliers and customers typically increase at the end of each year.

As such, the number of meetings is mere evidence of opportunity. The evidence loses its significance unless there is additional evidence that the meetings were for an improper purpose. Stated otherwise, even when viewed in the light most favorable to the government, a rational trier of fact could

---

**15.** To meet its burden of proving its case beyond a reasonable doubt, the government would have to do more than argue that the evidence of the legitimate purposes should not be believed by the jury. Rather, it would have to present some evidence, direct or circumstantial, that the meetings were in furtherance of the alleged conspiracy.

**16.** The government's chart on private meetings between Frenz and Liotier shows one meeting in June 1991, one in October 1991, three in November 1991, one in December 1991, three in January 1992, two in February 1992, and one in April 1991.

find, at most, that the frequency of meetings was unusual. That it was unusual, however, does not logically lead to the further inference that Liotier was working on DeBeers' behalf.

### C. Edward Russell's Testimony

The government next argues that the testimony of Edward Russell establishes that Liotier acted on DeBeers' behalf and that General Electric knew this. The government refers to three matters about which Russell testified.

### 1. Hiner's Alleged Suggestion to Davignon

■ The first matter the government refers to is a February 12, 1991 meeting attended by Glenn Hiner,[17] Peter Frenz, Philippe Liotier, and Viscount Davignon of Société Générale. Russell testified that Frenz told him that at the February 12 meeting, Hiner suggested to Davignon that Frenz and Liotier could work together to help "stabilize prices."[18]

There are several flaws in the government's reliance on this evidence. First, Hiner did not mention DeBeers. It is therefore unreasonable to infer from this comment that Liotier acted on DeBeers' behalf. It is equally plausible that Hiner's alleged suggestion referred to a request that Diamant Boart remain firm in the prices it charged its own customers so General Electric would not be obliged to continue to lower its own prices. Diamant Boart and General Electric had a common interest in preventing the further erosion of the prices of industrial diamond products in the face of an economic recession in Europe.[19]

Second, Liotier did not work for Hiner. He managed GES's largest European customer. He was not obligated to do anything Hiner may have suggested. Hence, even if it is assumed that Hiner was referring to De-Beers, Hiner's suggestion is not evidence that Liotier ever acted on DeBeers' behalf.[20]

Third, according to Russell's testimony, Hiner's alleged suggestion referred to "stabilizing" prices. There is nothing in the record to suggest that this term has a technical meaning beyond that found in an ordinary dictionary.[21] The indictment charges General Electric with a conspiracy to *raise* the list prices of its industrial diamond products. "Raise" is not a synonym for "stabilize."[22]

For the above reasons, the Court finds even when the evidence is viewed in the light most favorable to the government, a rational trier of fact could not reasonably infer from Hiner's alleged suggestion that Liotier was acting on DeBeers' behalf.

### 2. Frenz's Comment to Russell

■ Russell also testified that he received a telephone call from Philippe Liotier on November 1, 1991, at GES's Worthington office. Liotier allegedly asked to speak with Peter Frenz, who was in the next office. Russell allowed Frenz to use his office to take the call. Frenz and Liotier then had a private telephone conversation while Russell waited outside his office. Russell testified that Frenz told him that Liotier said that he (Liotier) was going to see DeBeers around November 19, 1991 on pricing and that afterwards Liotier would meet with Frenz.

---

17. Glenn Hiner was a senior vice president for General Electric. He was in charge of a division of General Electric businesses known as "Plastics." GES is an operating unit within the Plastics division.

18. This testimony came in over General Electric's vigorous objection. The Court ruled that what Frenz and Hiner allegedly said constituted *admissions of a party-opponent* under Fed. R.Evid. 801(d)(2)(D).

19. The indictment does not charge General Electric with violating antitrust laws through any agreement with its customer, Diamant Boart.

20. It is worth noting that the government does not assert that Hiner, or any GES employee, was

a co-conspirator. Rather, the government argues only that by making the alleged suggestion, Hiner "created the mechanism" for the charged conspiracy. In responding to General Electric's Rule 29 motion, the government made it clear that if General Electric was criminally liable, it was solely for the conduct of GES Europe employee Peter Frenz.

21. The 1981 edition of the *American Heritage Dictionary* defines stabilize as follows: "—*tr.* 1. To make stable. 2. To maintain the stability of. —*intr.* To become stable.

22. In this context raise means increase.

This evidence does not reasonably support an inference that Liotier was acting on behalf of DeBeers. Diamant Boart also bought industrial diamonds from DeBeers' distributors. Liotier met with representatives from General Electric in the course of his normal business activities as managing director of Diamant Boart. It not surprising that he would also meet with General Electric's counterparts at DeBeers.

### 3. The Taped Phone Conversation [23]

■ On April 19, 1992, an F.B.I. agent arranged to tape a telephone call from Edward Russell in the United States to Peter Frenz in Germany. The government asserts that it may be inferred that Liotier acted on DeBeers' behalf from two of Frenz's responses. First, Russell told Frenz that he taped the telephone conversation that Frenz had with Liotier in Russell's GES Worthington office on November 1, 1991. Frenz responded: "I hope you destroyed it." Second, when Russell talked about Liotier acting as the go-between, Frenz said, "Well, you see the discussion with Liotier was always done in a way that he's our customer."

Two equally plausible inferences can be drawn from Frenz's comment, "I hope you destroyed it." The first inference is that Frenz meant, "I hope [for my sake] that you destroyed it." The second is that Frenz meant, "I hope [for your sake] that you destroyed it." [24]

Moreover, even if it would be reasonable to draw only the inference that Frenz hoped for his own sake that Russell destroyed the tape, it would require stacking inferences to reach the conclusion that Liotier was acting on behalf of DeBeers. "I hope [for my sake] you destroyed it" implies guilty knowledge on Frenz's part. A rational trier of fact, however, would be left to speculate what was that guilty knowledge. To avoid stacking inferences, there would have to be evidence

that the guilty knowledge was that Liotier was acting on DeBeers' behalf.

The government emphasizes the second statement as follows: "Well, you see the discussion with Liotier was always done *in a way* that he's our customer." (emphasis added). This statement is more ambiguous than the first. There are a plethora of logical interpretations for the phrase, "in a way." It could mean, for example, "with the understanding that he's our customer." The government, in essence, relies on the interpretation "in a way that it would appear he's our customer, although we knew it was not true." The interpretation urged by the government is no more plausible than the others. [25]

In sum, the Court finds that even when the above evidence is viewed in the light most favorable to the government, no rational trier of fact could find beyond a reasonable doubt that it supports an inference that Liotier was acting on DeBeers' behalf.

### D. Documents and Communications

As a final category of evidence on this issue, the government argues that a rational trier of fact could reasonably infer that Liotier was acting on DeBeers' behalf from the communications and documents exchanged between Frenz and Liotier. The government organizes its arguments on this subject according to the various industrial diamond products that were the subject of the 1992 price increases. The Court will, for convenience, use the government's framework.

### 1. The Saw Diamond Price Increase

The government maintains that the following facts about the saw diamond price increase constitute circumstantial evidence from which it can be inferred that Liotier was acting on DeBeers' behalf.

The government first asserts that most of the information Frenz sent to Liotier on November 13, 1991 would have been of no direct use to Diamant Boart. The govern-

---

**23.** Although these are not Edward Russell's statements they are related to Russell's testimony and his involvement in the case.

**24.** Frenz testified that he made the statement because he believed it would have been illegal, at least under German law, for Russell to have recorded Frenz's November 1, 1991 telephone

conversation with Liotier. Such a recording would have violated United States law. 18 U.S.C. § 2511.

**25.** It is worth noting that English is not Frenz's first language.

ment maintains that Diamant Boart did not buy most of the products on the price schedule.

The Court finds that this evidence is insufficient to support an inference that Liotier was acting on DeBeers' behalf. As explained in section IV.B.3., *supra*, the evidence supports an equally plausible inference that Liotier was interested in the information because of the possible impact of these prices on Diamant Boart's competitors, among other reasons. Moreover, as stated earlier, what Liotier received does not, in any event, create more than a very slight inference, if any. Receiving information is a passive act. It says little, if anything, about whether Liotier was acting on DeBeers' behalf. It is entirely plausible that Liotier was not interested in the information even though he received it.

The government also refers to the December 4, 1991 profs note Frenz sent to Stephen Palovchik of GES.[26] Frenz said in the profs note, "I will be meeting Philippe Liotier on December 10, 1991 to *finalize our discussions*." (emphasis added by the government). On December 10, Frenz met with Liotier, presumably to "finalize discussions."

■ To "finalize discussions" does not necessarily mean to finalize discussions about price-fixing. As the Court has noted in earlier decisions, it is equally plausible that this phrase refers to the vertical gangsaw ("VGS") contract,[27] and Diamant Boart's commitment to purchase diamonds from General Electric to secure General Electric's approval of the contract. The Court finds that the profs note does not reasonably support an inference that Liotier was acting on DeBeers' behalf.

On December 13, 1991, Liotier sent to Frenz DeBeers' plans for a price increase and new product introduction, which DeBeers planned to carry out in February and

March 1992. In September 1991, DeBeers had told its customers that it was not planning a price increase in 1992 and that it might, in fact, decrease prices.

This evidence shows that DeBeers changed its mind. It does not reasonably support an inference that Liotier was acting on DeBeers' behalf.

■ When Palovchik received the information about DeBeers' plans on December 16, 1991 he was concerned about the legality of GES using the information. Palovchik therefore discussed it with GES general counsel Chris Kearney.

Palovchik's concerns do not reasonably support an inference that Liotier was acting on DeBeers' behalf, especially when it is considered that Palovchik went forward after receiving counsel.[28]

On December 19, Liotier faxed Frenz a page of DeBeers' prices for certain Syndite and Syndrill products. The cover sheet from Liotier says: "Enclosed [is] the information requested on Syndite and Syndrill."

That Frenz requested, and Liotier provided, this information does not support an inference that Liotier was acting on DeBeers' behalf. It is equally plausible that Frenz and Liotier were acting as supplier and customer.

On January 6, GES sent to its sales force an announcement explaining its MBS price increase. Upon receiving the January 6 notice, Frenz told Palovchik to add MBS–70 to the price increase because DeBeers was including its comparable medium grade diamond in its price increase. GES added MBS–70 to the price increase to make its pricing consistent with DeBeers.

The following day, January 8, 1992, Frenz met with Liotier. Before the meeting, Frenz received a fax price list from Palovchik. The list was amended by hand to reflect the addition of MBS–70 to the price increase.

---

26. Palovchik was GES's sales manager in 1991–92. Frenz reported to Palovchik.

27. VGS was a joint project between General Electric and Diamant Boart to develop a new saw to cut stone. Diamant Boart sold VGS in late 1991 to a Japanese company with General Electric's consent.

28. It is also questionable whether the Court should allow such evidence to be used to attempt to support such an inference, as it would tend to have a chilling effect on corporate officers legitimately seeking advice of counsel.

These actions, taken by Frenz and Palovchik, and not Liotier, are not probative of whether Liotier was acting on DeBeers' behalf.

The week after medium grade products were added to GES's price increase at Frenz's request, he asked to have the price increase altered. Palovchik made the requested revisions. The revisions made GES's proposed prices closer to DeBeers' proposed prices. Palovchik immediately faxed the new GES prices to Frenz. Two days later, on January 16, Frenz met privately with Liotier in Brussels. On January 20, the MBS price increase was announced to the trade, to be effective February 17.

The actions of Frenz and Palovchik do not demonstrate whether Liotier was acting on DeBeers' behalf. It is equally plausible that they would have reacted in this manner to the competitive information Liotier provided regardless of whether Liotier was acting as a customer or on DeBeers' behalf.

## 2. The Compacts Tooling Price Increase

The government also asserts that the manner in which the compacts tooling price increase took place indicates that Liotier was acting on DeBeers' behalf. In 1991, GES planned a realignment of Compax prices.

■■■ The information about DeBeers' pricing plans Liotier provided to Frenz on December 16, 1991 included DeBeers' plan to increase its compacts tooling prices. On December 19, Liotier faxed Frenz specific Syndite prices for eight products. By contrast, DeBeers' own distributor, DAC, as of December 19, was told only that it would be advised of the specific new prices in early 1992. DeBeers did not provide the information to DAC until January. After receiving advance notice of DeBeers' plans for Syndite, GES made changes in its pricing plans for Compax.

On January 6, 1992, Mike Abrams, GES's Compax product manager, sent Frenz "preliminary specifics regarding our proposed price increase for Compax diamond tool blanks." On January 8, Frenz met privately with Liotier in Brussels. Also on January 8, Abrams sent each of GES's sales managers the proposed changes in Compax pricing. If Abrams had not sent Frenz the preliminary specifics on January 6, Frenz would not have had them for his January 8 meeting with Liotier.

Liotier's act of sending competitive pricing information to General Electric is consistent with the actions of a customer. Moreover, actions taken by General Electric and its employees do not reasonably support an inference that Liotier was acting on behalf of DeBeers. General Electric's actions would as likely have been the same if Liotier was acting as a customer.

GES made some changes to its Compax prices based on the DeBeers' prices and issued a new price list to its sales force on January 16, 1992. The next day, January 17, Frenz faxed Liotier the final revision of the Compax pricing. Although Liotier received advance notice from GES and from DeBeers of their compacts tooling pricing plans, Diamant Boart buys essentially no compacts tooling in Brussels.

General Electric's conduct, and Liotier's receipt of information, does not show that Liotier was acting on DeBeers' behalf.

The government also points out that it was known by late December 1991 that Liotier's tenure as general manager of Diamant Boart would officially expire on January 1, 1992, but Liotier received both GES's and DeBeers' compacts tooling pricing plans in late December and early January.

At least three government witnesses, Roemmele and Whitehead, both of Diamant Boart, and Volkmar Murer of GES Europe, testified that Liotier continued to work on Diamant Boart matters during the transition period in early 1992. In light of this uncontroverted evidence, Liotier's receipt of information after his official date of exit from Diamant Boart does not reasonably support an inference that Liotier was acting on DeBeers' behalf.

## 3. The Drilling Products Price Increase

In Fall 1991, GES considered raising prices for its drilling products, but it decided that a price increase could not be successfully implemented. Mark Harnden, GES's drilling products manager, received the com-

plete list of Syndrill prices sent by Liotier, through Frenz, on January 9. After receiving DeBeers' Syndrill prices, GES decided that it would raise its drilling products prices, matching DeBeers' prices to the nearest dollar.

Harnden gave Murer, the GES salesman responsible for Diamant Boart and a member of the drilling products team, a copy of the January 9 fax from Frenz. When Frenz learned that Harnden had conveyed this information, he was extremely concerned even though Murer had a legitimate business reason to know. No similar concern had been shown when normal competitive information was shared with appropriate salesmen in the past.

Harnden prepared a draft of the drilling products price increase announcement. He faxed it to GES managers on January 27. Before January 24, however, he was told that Frenz would need a copy of the draft by January 24 because he was meeting Liotier on January 27. Harnden sent the draft information to Frenz on January 24.

Harnden was told that Frenz had said that DeBeers was concerned that it was not seeing the GES drilling products price increase reflected in the marketplace. Harnden then discussed DeBeers' alleged concerns with Palovchik. Palovchik asked Harnden for a copy of the GES confidential memo to the sales force announcing the drilling products price increase. Palovchik said he would "take care of it." On February 18, 1992, Frenz sent a copy of the memo to Liotier. Harnden later asked Palovchik if he had "taken care of it" and Palovchik said that he had. Harnden said he did not want to know what had transpired because he was afraid the acts were inappropriate.

As previously discussed, actions by General Electric employees do not, in these circumstances, show that Liotier was acting on behalf of DeBeers. It is as likely these events would have taken place if Liotier was acting on Diamant Boart's behalf as General Electric's customer.

### 4. Delay of PCD Diamond Price Increase

On February 19 and 24, 1992, GES sent memos to its staff announcing a delay in the Compax and drilling products price increases from March 2 to March 16. On February 26, Frenz sent Palovchik a profs note stating:

> Based on some early reactions I receive, a delay of our price increase for polycrystalline material will jeopardize our entire price increase including saw diamond. I will be in Brussels tonight and will telephone you from there to discuss further details. Please do everything possible to avoid a delay of our price increase.

In Brussels that night Frenz met privately with Liotier and discussed the delay.

On February 27, when John Blystone arrived in Frankfurt, Germany, Frenz asked him what he should tell Liotier about the PCD price increase. Blystone told Frenz that he had told Palovchik that the PCD price increase would be effective March 2, and would not be delayed. Frenz then telephoned Liotier to inform him that the PCD price increase would not be delayed. This occurred when Liotier was no longer general manager of Diamant Boart, and involved products (compacts tooling and drilling products) that Diamant Boart did not buy.

As the Court has already discussed, the actions of those at General Electric do not, in these circumstances, give rise to a reasonable inference that Liotier was acting on DeBeers' behalf. It is as likely that these same actions would have been taken regardless of whether Liotier was acting as a customer or for DeBeers.

### E. Viewing the Evidence as a Whole

The Court has viewed individually the components of the government's case. The government also contends, however, that when the evidence of Liotier's actions is considered as a whole, a rational trier of fact could conclude that Liotier was acting on DeBeers' behalf.

The government's case lasted about five weeks. Even when time for cross- and recross examination, conferences, and oral argument is taken into account, it is clear the government has offered an enormous amount of evidence. The Court must view the government's evidence cumulatively to determine whether it is sufficient to withstand

General Electric's Rule 29 motion. Nevertheless, the Court cannot simply conclude that the evidence is sufficient based upon its sheer volume.

 Viewing the evidence as a whole, and in the light most favorable to the government, the Court still concludes that the evidence is insufficient to sustain a finding beyond a reasonable doubt that Liotier was acting on behalf of DeBeers. The individual components of the government's evidence fall into one of two categories: those that do not support an inference that Liotier was acting on behalf of DeBeers; and those that could support such an inference, but also support an equally plausible inference that Liotier was acting as a customer on behalf of Diamant Boart. Examining these components together does not alter the fundamental flaw in the government's case: Liotier's actions are consistent with those of an industrial diamond customer interested in receiving information about a proposed price increase and willing to give information about one supplier to another supplier. This is true even when the evidence is viewed as a sequence of events.

The government has established that Frenz and Liotier exchanged information. This is not an information exchange case, but a price-fixing case. The actions of Frenz and Liotier are as consistent with the perfectly legal conduct of a supplier and a customer as they are with the government's theory of a price-fixing conspiracy. The sum of the evidence offered by the government on this issue is not, in this case, greater than the component parts.

### F. Conclusion

It would have been difficult for the government to prove its case even in the best of circumstances. Here, however, the government's usual burden of investigating and proving its case was made more difficult because three of the four named defendants, and many potential witnesses, are foreign nationals beyond the jurisdiction of this Court. The government, however, went forward with the prosecution of this case and

took upon itself the burden of prosecuting, and attempting to link together, the absent eidolons Philippe Liotier and DeBeers.

It is beyond dispute that the government's attorneys worked diligently to uncover and present the government's case. In some instances, witnesses who offered testimony favorable to the government at the grand jury stage changed or explained their testimony, after reviewing relevant documents and refreshing their memories, in a manner that rendered their trial testimony either neutral or, in some cases, favorable to General Electric. In other instances, the government attorneys made good faith efforts as zealous advocates to substitute the testimony of available witnesses for those witnesses it ideally would have called.[29] These efforts to compensate for the dearth of supporting evidence, however, were unsuccessful.

The Court cannot speculate, and more importantly, cannot allow the jury to speculate, about what the government could have proved if the best witnesses had been available. Rather, it is the Court's duty, under Rule 29, to examine only the evidence the government actually adduced in its case.

Perhaps in recognition of the above-mentioned weaknesses in its case, the government has, in responding to General Electric's Rule 29 motion, presented some unusual and even startling theories for proving its case. During oral argument on the Rule 29 motion, government counsel made the following statement in response to a question from the Court:

I don't, Sir, believe that DeBeers ever authorized Mr.—and the government's position is not that they authorized Liotier to enter into an agreement.

Tr. 12–1–94 at 3693. Similarly, in its reply filed on December 2, 1994, the government states:

The charging document clearly sets forth what has been the United States' position since the start of this case: that Liotier received future pricing information from GE and provided DeBeers' future pricing information to GE "for the benefit of the

---

**29.** For example, the government tried to substitute the testimony of the Belgian Judicial Police officers for that of Rene Lorent on the issue of Lorent's record retention practices.

industrial interests of SIBEKA and De-Beers." Indictment at 6.

Government's reply at 2. The apparent thrust of the these arguments is that because Liotier's actions may ultimately have benefitted DeBeers in some manner, the government may sidestep the requirement of proving that Liotier was acting on DeBeers' behalf.[30] This rather chimerical theory appears to be somewhat akin to the principle of acquiescence under civil agency law.

The government's arguments are without merit. This is a price-fixing conspiracy case under the per se rule.[31] It is not an information exchange case governed by the rule of reason principle.[32] DeBeers is the only General Electric competitor mentioned in the indictment. Without DeBeers there could not, by definition, be a conspiracy to fix prices. Unless Liotier was acting on De-Beers' behalf, there is no evidence of De-Beers' participation in a price-fixing conspiracy with General Electric. If Liotier was not acting on DeBeers' behalf, he was acting for Diamant Boart, a customer, and the actions of General Electric, Frenz, and Liotier were, under the applicable law, innocent. Indeed, in describing the charged conspiracy, the government recognizes this requirement in another part of the indictment:

> The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendants to raise list prices of industrial diamond products. To coordinate and carry out the conspiracy to raise list prices, GE and

DeBeers *provided* each other with advance, detailed information reflecting their future list prices and pricing plans.

Indictment para. 13. The clear import of the active voice phrase, "DeBeers provided" is that, as logic would dictate, DeBeers is charged as an actor in this case. Under the indictment and the evidence adduced in the government's case, DeBeers could have acted only if Liotier was acting on its behalf.[33] In sum, the Court will not remove the requirement that the government must prove that Liotier was acting on DeBeers' behalf.

Proving that Liotier was acting on De-Beers' behalf was a crucial link in the government's case. It is a link the government failed to establish, despite herculean efforts, even under the relatively low hurdle of the sufficiency of the evidence standard. Based on the above, the Court finds that even when the evidence is viewed in the light most favorable to the government, no rational trier of fact could find beyond a reasonable doubt that Liotier was acting on behalf of defendant DeBeers.

### V.

For the above reasons, the Court **GRANTS** General Electric's motion for judgment of acquittal under Fed.R.Crim.P. 29.

**IT IS SO ORDERED.**

---

**30.** *Of course, many of Liotier's actions would naturally benefit DeBeers. Liotier was the managing director of Diamant Boart, a company that bought industrial diamonds from DeBeers' distributors.*

**31.** *See* Indictment, paras. 2 and 13; *see, e.g., United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940).

**32.** *See United States v. Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2876 n. 16, 57 L.Ed.2d 854 (1978); *Continental Cablevision v. American Electric Power Co.,* 715 F.2d 1115, 1118–20 (6th Cir.1983) (exchange of price information does not constitute per se violation of the Sherman Act). Indeed, the government *opposed,* and the Court rejected, General Electric's request for a "rule of reason" instruction, which would have

created an alternative basis upon which the jury could have found General Electric guilty. In denying General Electric's request, the Court found that the indictment clearly charges General Electric with conspiracy to fix prices, no more and no less. To have gone beyond the price fixing charge would have constituted an improper constructive amendment of the indictment. *See United States v. Ford,* 872 F.2d 1231, 1235 (6th Cir.1989) (constructive amendment of indictment constitutes per se reversible error).

**33.** This is especially true considering that the government relies solely on the actions of Peter Frenz to establish General Electric's liability. The government never attempted to prove that Frenz dealt with anyone other than Liotier. From the indictment until it rested its case, the government focused on the conduct of Frenz and Liotier.